[Crim. No. 4881.  In Bank.  Nov. 1, 1948.]

THE PEOPLE, Respondent, v. JOSEPH ROY HAMILTON et al., Appellants.

Milton Stansky and Kenneth Carlton Zwerin for Appellants.

Fred N. Howser, Attorney General, Clarence A. Linn and Leo T. Englert, Deputy Attorneys General, for Respondent.

EDMONDS, J.—Joseph Roy Hamilton and Alfred Bundy were convicted of burglary and their appeal from the judgments and from the orders denying a new trial presents, as one of the questions for decision, the admissibility of a record of conviction for the purpose of impeachment. Other grounds for reversal relied upon have to do with the sufficiency of the evidence to support the verdicts, an asserted lack of corroboration of the testimony of an accomplice, and the court's failure to give certain instructions as to an accomplice's testimony.

The appellants were jointly charged with the commission of three burglaries. The first of these, according to the informa-

tion, occurred on November 7, 1946, when Lester's Market in San Carlos was entered and a small safe, containing about $2,300 was taken from it. Three weeks later, the Lucky Tower Market in San Mateo was broken into with the loss of 47 cases of whiskey. The last count of the information alleged that the Carlos Market was entered on the night of December 23, 1946, and a desk ransacked. Upon the first count the jury found Bundy guilty and acquitted Hamilton; they were both acquitted as to the burglary of Lester's Market and convicted of the crime charged in the third count.

Hilliett Roy Johnson was admittedly an accomplice in the entry of the Carlos Market. As a witness for the prosecution, he gave the jury an account of his association with Hamilton and Bundy on the night when this crime was committed. He met them about 7 p. m. at the corner of Post and Buchanan Streets in San Francisco. At that time Bundy, whom he had "seen around" for about nine months, spoke of "making some money" and Johnson asked "about cutting me in." After some discussion, Bundy agreed to "cut him in" for about $300 if Johnson would take out the back seat of his Buick sedan and haul 20 cases of whiskey in it.

Hamilton came up at this time and he and Johnson removed the rear seat from the Buick. Bundy prepared his Lincoln Zephyr in the same way and then drove down the Bayshore Highway, followed by Hamilton and Johnson in the Buick. Just before they reached the San Francisco County line, a traffic officer stopped Bundy and cited him for speeding. The three men then went on to Redwood City where Johnson and Hamilton entered Bundy's car. During the ride to Redwood City, Hamilton had said nothing to Johnson about what they proposed to do, except that they were going to pick up some whiskey; "Bundy knew where it was and Hamilton where to follow him."

With Bundy driving the Zephyr, the three men cruised around San Carlos and San Mateo, "casing" the markets in that vicinity. As they passed the Lucky Tower Market, the store mentioned in count two of the information, Bundy said that "we" took about 40 cases of whiskey from it and he explained some of the details of the burglary. When they passed Lester's Market, which is the place where the crime charged in count one was committed, Bundy said, "We got two grand out of there," and he mentioned "a nice little safe." During this part of the ride, Bundy did all of the talking;

neither Hamilton nor Johnson commented upon his statements.

Continuing his testimony, Johnson said that they then returned to Redwood City where his car was parked near the home of Etta Rae Moulton. All of them went into the house, and before leaving at about twenty minutes to eleven, they had some beer and soft drinks. Hamilton and Johnson again got into the Buick and followed Bundy in his car. Johnson stopped at a service station and bought some gasoline for the Buick which Hamilton paid for. Hamilton then directed Johnson to drive to the Carlos Market. When they arrived, he told Johnson to park the Buick about 50 yards away from the store where he could watch the back door. The Zephyr was behind the building with Bundy standing beside it.

Johnson and Hamilton remained in the Buick until Bundy entered the market and came out through the back door. Hamilton then got out and ran over to where Bundy was standing. They spoke to each other and Bundy went back into the market, leaving Hamilton outside. Bundy came out again and, after saying something to Hamilton, they both entered the building.

It was a very dark night and as Johnson waited alone outside he "got afraid." He turned on the engine of his car and sat there watching the rear door of the market. Just then, Johnson saw someone flashing a light. "They threw the light on Bundy's car then they drove up and flashed the light on my face," Johnson told the jury. Two officers got out and approached Johnson. One went around to the right rear of the Buick. The other came up beside Johnson and asked him what he was doing there.

The officer started to open the car door and Johnson drove off. He heard several shots and by the time he reached Bayshore Highway he could see the officers' car following him. Johnson explained that he was "going back to San Francisco if (he) could get there" and was traveling "pretty fast." The car got out of control and crashed into another automobile, killing a man. Johnson was badly injured, but he managed to walk to a house where he asked that the police be called.

The following day, at the hospital where he had been taken, Johnson told the police the full story of the events of the preceding night. When he testified against Bundy and Hamilton, he was under arrest on a manslaughter charge arising

out of the accident, but no charge had been brought against him in connection with the burglary.

Each of the appellants testified at the trial. In defense of the charge specified in count one, Bundy claimed that on the 7th of November he was at an all-night party in Richmond with Brown. Hamilton asserted that he was not then in the state and, according to his and Bundy's testimony, at the time of the burglary of the Tower Market they were at an all-night poker game in San Francisco. Hamilton accounted for his whereabouts on December 23d with the statement that he was in Oakland with "his girl" and Bundy told the jury that when he was stopped for speeding on Bayshore Highway he was en route to Mills Field to meet a young woman with whom he returned directly to San Francisco.

The record shows that during the cross-examination of Bundy, the district attorney inquired as to where he had been just prior to coming to San Francisco. When Bundy replied that he was then in Los Angeles, the prosecutor asked what he was doing there. Bundy replied: "I was in jail." The next question was: "Have you ever been convicted of a felony?" Bundy answered: "I will let my lawyer answer that for me." Upon being admonished by the trial judge that he must answer the question, Bundy said: "I don't know the law, I don't know what to say." Over the objection of counsel for Bundy, the trial judge then received into evidence a certified copy of a judgment of conviction of Bundy for the crime of burglary of the second degree committed in Los Angeles county. The sentence imposed for the offense was imprisonment in the county jail for a term of six months.

Section 2051 of the Code of Civil Procedure provides: "A witness may be impeached by the party against whom he was called . . . by evidence that his general reputation for truth, honesty, or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony." Section 17 of the Penal Code provides in part: "A felony is a crime which is punishable with death or by imprisonment in the state prison. Every other crime is a misdemeanor. When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in the county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment other than imprisonment in the state prison. . . ."

The defendants contend that these two sections must be read *in pari materia,* and that since the judgment shows a sentence to the county jail, the crime became a "misdemeanor for all purposes" and the record was not admissible for the purpose of impeachment. The attorney general argues that section 17 of the Penal Code does not control the provisions of the Code of Civil Procedure; it has to do with the effect of the judgment, whereas the Code of Civil Procedure specifies the methods whereby a witness may be impeached, including the "conviction of a felony," which has been held to mean in regard to that statute, merely a plea of guilty or the verdict of the jury. These two sections must be considered together, and the judgment of conviction with the sentence of imprisonment in the county jail did not subject Bundy to the statutory deprivation of credibility.  As to a crime which may be either a misdemeanor or a felony, depending upon the punishment imposed therefor (Pen. Code, § 17), it is the punishment specified by the sentence which determines the character of the crime "for all purposes" (§ 17) including that of impeachment. (*People* v. *Lando,* 92 Cal.App. 405 [268 P. 439]; *People* v. *McGee,* 24 Cal.App. 563 [141 P. 1055].) Therefore, the ruling of the court admitting the record of Bundy's prior conviction was erroneous.

Error in the instructions to the jury is also relied upon as a ground for reversal of the judgments of conviction. The appellants characterized the instructions as vague and ambiguous. A more specific complaint concerns the court's failure to tell the jurors that Johnson was an accomplice in the commission of only the offense charged in the third count of the indictment; moreover, the instructions stated that Johnson was an accomplice as a matter of law and also presented, as a question of fact, his status in this regard. The final contention is that the court committed prejudicial error in failing to instruct the jurors in the language of section 2061 of the Code of Civil Procedure that "the testimony of an accomplice ought to be viewed with distrust."

The attorney general takes the position that the instruction "to view with caution the testimony of any witness which purports to relate to an oral admission of the defendants or an oral admission by him," in effect, was a substantial compliance with the statutory requirement. However, the statute specifies a different standard for weighing accomplice testimony from that of oral admissions generally. The oral

admissions of a party are to be viewed with "caution" and that of an accomplice with "distrust." The two words are quite different. Caution demands care and watchfulness. Distrust includes meanings ranging from doubt and suspicion to lack of confidence. A jury's estimate of evidence which it was directed to view "with caution" might, and ordinarily would, be quite different from the effect which it would give to the same evidence considered "with distrust."

As further support for his position that the failure to instruct the jury in the language of section 2061 concerning the test for considering the testimony of an accomplice does not constitute error, the attorney general calls attention to the appellants' failure to request such a charge. He concedes that the jury must be instructed upon the court's own motion, if not requested by counsel, as to certain propositions of law. But he argues that in a case such as the present one, a reversal is justified only "when the jury have not been able to clearly detect or distinguish a witness as an accomplice or when the court has issued an instruction contrary to the law of evidence produced by an accomplice."

It is, of course, true that not every failure to instruct in the terms of the statute is reversible error. (*People* v. *Koenig,* 29 Cal.2d 87 [173 P.2d 1].) The question for an appellate court under such circumstances is to determine whether, considering the entire record, the error prejudiced the defendant's rights. (Const. art. VI, § 4½.) If it cannot be said that, under correct instructions, a different verdict would have been improbable, the erroneous ruling constitutes a miscarriage of justice, within the meaning of the constitutional provision. (*People* v. *Rogers,* 22 Cal.2d 787 [141 P.2d 722] ; *People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367].)

In *People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828], this court upheld the statutory test for considering the testimony of an accomplice and stated that an instruction in the language of section 2061 is necessary "in a proper case and the failure so to instruct may be reversible error." (P. 656.) Certainly this is such a case. The convictions of Hamilton and Bundy rest principally upon the testimony of the accomplice Johnson, and it is not improbable that, had the jury been instructed to view his accusations against them "with distrust," it would have returned different verdicts. Also, the record of Bundy's prior conviction, erroneously presented to the jury, unquestionably had much effect.

The judgments and the orders denying a new trial are reversed, and the cause remanded for a new trial.

Gibson, C. J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied November 29, 1948.