[Crim. No. 21405. Nov. 26, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN VINCENT HOLT, Defendant and Appellant.

**COUNSEL**

Lynn O. Taylor and Quin Denvir, State Public Defender, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien,

Assistant Attorney General, William D. Stein, Herbert F. Wilkinson, Ronald E. Niver and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, J.—Defendant Steven Vincent Holt was convicted on one count of first degree murder (Pen. Code, § 187) with the use of a deadly weapon (*id.*, § 12022.5) and one count of robbery (*id.*, § 211) with the use of a deadly weapon (*id.*, § 12022.5). Under the 1978 death penalty law, a special circumstance that the murder occurred while Holt engaged in and was an accomplice in the commission of a robbery (*id.*, § 190.2, subd. (a)(17)) was found to be true. He was sentenced to death. The appeal is automatic.

Holt raises many contentions with respect to all phases of his trial. We have reviewed all the issues raised and find that prejudicial errors occurred in the guilt phase of the proceedings below. We therefore reverse the judgment finding Holt guilty of first degree murder and of robbery.

I

On February 8, 1979, about 7 p.m., Sam Troia was shot and killed in a parking lot next to Troia's Market in Monterey. Troia had just closed out the registers in the market with his brother and was taking home the daily receipts in two black vinyl bags.

A number of witnesses heard a loud noise and saw two men leaving the scene of the crime. Other witnesses saw two men in the vicinity before the crime. Officers who came to the scene found various bills of money scattered throughout the street and found two $20 bills lying in the gutter where a witness had seen two men enter a car.

Sam Troia died of massive internal hemorrhaging due to damage done to internal organs from a gunshot wound. He was killed by a .38 caliber bullet, either a semi-wad cutter or a round nose lead bullet. The bullet had entered his lower right arm, exited between the wrist and the elbow and entered the abdomen just below the rib on the right side.

On the day after the shooting, Friday, February 9, 1979, two of the witnesses went to the Monterey County Sheriff's office for the purpose of

constructing composite faces of the two men they had observed. After the composites were made they were distributed among law enforcement agencies and the media. On Sunday, February 11, 1979, Juan Eduardo De George and Holt were arrested and taken to the Monterey police station.

The information filed on June 4, 1979, accused Holt of first degree murder (Pen. Code, § 187)[1] with the use of a firearm (§ 12022.5) and robbery (§ 211) with the use of a firearm (§ 12022.5). It was alleged that the murder was committed while Holt engaged in and was an accomplice in the commission of a robbery (§ 190.2, subd. (a)(17)). The information also alleged two prior felony convictions within the purview of section 667.5, subdivision (b).

Holt demurred to the information on the basis that the death penalty was unconstitutional. The court overruled the demurrer on June 21, 1979. Defendant's section 995 motion based on the restricted cross-examination of prosecution witness Gary McGowan, was denied on July 12, 1979.

Holt filed a motion for change of venue on September 4, 1979. It was denied on September 7, 1979. On September 20, 1979, the Court of Appeal stayed all proceedings pending determination of Holt's writ of mandate for change of venue. On November 8, 1979, the Court of Appeal denied the writ and dissolved the stay.

Holt's motions for sequestration of the jury and for separate juries were also denied. Holt's motion for a closed voir dire was granted in part.

Jury selection began on January 4, 1980. A single "death qualified" jury was empaneled for both guilt and penalty phases.

*Prosecution Case*

As will appear, the only real factual issue was whether the murder was committed by defendant Holt or his accomplice Juan Eduardo De George.[2] While several other witnesses testified to parts of the events which culmi-

---

[1] Unless otherwise noted all statutory references are to the Penal Code.

[2] After first denying involvement in the shooting of Troia, De George later confessed to his participation. For his part in the crime, he ultimately pleaded guilty to second degree murder and robbery and was sentenced to 15 years to life. De George agreed to testify against Holt at trial.

nated in the murder, none shed much light on the identity of the killer. Their evidence is summarized below.[3]

---

[3]Kenneth Smith testified that he and his wife manage a shop near Troia's Market and that on the evening of February 8, 1979, he saw a man standing beside the entrance to the parking lot. The man wore a ski-type stocking cap and a plaid jacket with the collar turned up. As Smith and his wife drove out of the lot they noticed two men in the same place as the first man. One man had a darker complexion and a smaller build than the other. Both were dressed alike.

Vickie Smith testified that she got a good look at the two men and that she helped the police prepare a composite of the lighter complected man. Mrs. Smith identified Holt as the lighter complected man she had seen.

Judy Purrington testified that she had parked her car in the lot near Troia's Market. As she passed the market she saw Troia locking the door and talking to a man. When she got to the lot she heard a loud noise behind her. She then heard someone say "you dirty bastard," saw a man bending down near a car and saw two people running up the street, one ahead of the other.

Henry Lane, who worked in an office adjoining Troia's Market, testified that his car was also parked in the lot next to the market. As he passed the market he noticed Sam Troia talking to a man in a suit and tie. He then saw Sam Troia walk towards his car carrying some small pouches. As Lane passed a picket fence next to the lot he saw two men coming out of it. He described one as Hispanic in his early twenties, dressed in a closed, Mackinaw-type coat with a watch cap. The other man was dressed in similar fashion. Lane continued to the lot and while there heard a shot and a loud voice say, "Oh, my god." Lane started to run for his car, looked back and saw the Hispanic man running up the hill. A composite drawing was prepared from the description provided by Lane.

James P. Felix testified that he had attended a meeting in Monterey on February 8, 1979, and went to Troia's Market to get directions to the Antler Inn. He met two men outside the market locking the doors. One man provided him with directions while the other proceeded towards a car. The man Felix talked to was carrying a satchel and the conversation lasted two to three minutes. As he walked back to where he had parked his mobilehome, he noticed a 1969 or 1972 Impala, Pontiac or Chevrolet, with a man in it.

Anthony Troia testified that he closed the market with his brother Sam. They had put the coins in little money bags and the bills in a larger bag. After they had done this, they left the market together. Anthony Troia walked ahead as his brother stopped to give a man directions, he looked back, saw that his brother had finished talking to the man, and continued on to his Toyota truck. He heard a sharp sound as he was starting the truck and saw people with checkered shirts standing in back of the fence by the parking lot. He did not notice anything as he drove by his brother's car.

Clifford Barker testified that he was with a friend, Terry Domnick, in the kitchen of his apartment which overlooked the parking lot. They heard a loud noise, and his friend opened the curtain and said that someone was shot. Barker turned off the lights in the apartment so they could look out of the window without being seen, when he got back to the window, his friend said, "He's down." Domnick had called the police while he was looking out the window and they both ran out of the house, jumped the back fence and ran towards the victim. Barker waited for the police to arrive as Domnick ran in a different direction.

Domnick stated that he heard a noise like a backfire or gunshot and immediately looked out of the window. He saw a man go down in front of a car and he called the police. He saw one man run up the street, and another man bent over the victim. He then saw the remaining man run up the street. When he and Barker went outside, he ran up the street to see if he could find the men that were running, but was unable to do so.

Bill Williamson, who lived near the scene of the crime, testified that he heard a backfire from a car and looked out his kitchen window. He saw two men running up the sidewalk and enter a bright colored, American made car. The men wore stocking caps with masks on the front part of them and short-tailed coats. They drove away without the headlights on.

De George testified that in February 1979, he and Holt lived next door to each other in Monterey. About 4 p.m. on February 8, 1979, De George and Holt drove De George's green 1968 Buick to the residence of F. A. Bright in Seaside. De George and Holt were planning to commit a robbery and went to Bright's house to get a handgun for Holt. Bright lent Holt a .357 magnum but said he wanted it returned. Holt and De George left Bright's house about one hour later. At the time Holt had the gun inside his sweatshirt.

De George drove to New Monterey where he dropped Holt off at the home of a friend of Holt's. Holt told De George to return "just before dark." De George returned to pick up Holt shortly before 6 p.m. They discussed a robbery and possible victims. De George stated that he wanted a gun. At Holt's suggestion, they drove to an address in Seaside where they picked up a .22 caliber revolver.

The two then headed back to Monterey and discussed robbing a gas station. They rejected this idea because a gas station was "too open" a target. As they drove randomly around Monterey, they found themselves near Troia's Market. Holt suggested that they rob the market because the store closed at 7 p.m. and the manager usually took the receipts home at night. Holt told De George that "all we'd have to do is, . . . like run up, flash a gun, and the person would give up the money."

As they drove past the front of Troia's Market they noticed that the lights in the market were already off and the store was in the process of being closed. They drove by the market slowly and drove up the block to the corner where they turned and parked near a mailbox. They proceeded from the car to a parking lot near the market.

Both of them were wearing knit "watch caps" and plaid coats. When they reached the parking lot Holt put a bandana over his nose. De George testified that he told Holt it was "too soon" to put the bandana on. The men first stood near the entrance to the parking lot waiting for the market to close; later they walked to a picket fence near the sidewalk.

Shortly after 7 p.m. De George saw a man walk to a red truck parked in the lot. As he started towards the man, Holt waved him off. He then saw another man walking towards a big brown car; Holt motioned to De George to "go ahead." De George walked up behind the man and tugged on the vinyl bag the man was carrying under his left arm. The man tightened his grip, turned around to face De George, and said "What's going on?" De George then heard a shot, turned around and saw Holt with a gun in his hand. He turned back and saw the man on the ground. He heard the man

say, "You son of a bitch. You didn't have to shoot me." De George bent down, picked up one of the vinyl bags and ran up the street. When he got into his car, he looked back and saw Holt bending over. Holt then ran to the car. He got in. De George gave him the .22 and he put it in the glove compartment. Holt said "I hope I didn't kill the man. I hope I shot in the arm or the leg." When Holt returned to the car he was carrying another vinyl bag. As they drove off, Holt told De George that he had "dropped all kinds of money." De George replied, "Who cares about the money. You know, there's a guy who's been shot down there."

When De George drove away he kept his lights off for about one block and then drove to a gas station for gas. From the station, Holt drove to F. A. Bright's house. While at the station, De George looked in the vinyl bag and said "we got nothing but checks." Holt then showed him the other bag which contained money.

When De George and Holt arrived at Bright's house, the three went into a bedroom and split up the money. Holt and De George gave Bright $300 for the use of the gun. Before leaving Bright's house, Holt and De George put their caps, bandanas and the stolen checks into the vinyl bags. Bright promised to destroy them. De George gave Bright another $250 to purchase cocaine for him, and Holt gave Bright $200 to buy heroin. Bright left and returned an hour later with the narcotics. De George "fixed" with cocaine and heroin about three or four times that evening. He saw Holt fix once with heroin.

De George and Holt left Bright's house about 11 p.m. and drove to a friend's house in Seaside. They heard a TV broadcast that Sam Troia had died as a result of a gunshot wound. De George went home to talk to his wife because she was a distant relative of Sam Troia. Holt remained at the friend's house. De George returned about 1 a.m. to pick up Holt and drive him home.

The People also introduced the testimony of Gary Lynn McGowan who testified that on March 12, 1979, he was in county jail awaiting sentencing on a second degree burglary charge. Holt was housed in the same pod as McGowan. In the early hours of March 12, 1979, McGowan had a conversation with Holt. Holt told McGowan that he and another person named Juan had committed a robbery. He told McGowan that he and Juan obtained a .357 gun as well as a .22 gun and that he told Juan to waive the gun in the victim's face "so that he won't hassle him." Holt told McGowan that Juan "didn't stick the gun in the guy's face," and just pointed the gun at the victim and grabbed for the bag. When the victim started wrestling with Juan, Holt ran up, pushed him away and shot him. McGowan testified that

Holt stated he thought he had shot the victim in the arm and was surprised to see him fall down.

The People also introduced testimony pertaining to Holt's escape from county jail on June 21, 1979.[4] (Several months before the instant case went to trial, defendant was found guilty of escape with force and great bodily injury [§ 4532] and of battery on a peace officer [§ 243, subd. (b)].)

*The Defense*

Holt testified on his own behalf. He stated that he had worked for Troia's Market from August 1976 to February 1977. On February 8, 1979, De George asked him to go with him to see a Frank James. They drove to Bright's house where De George talked to James about a pistol. While James and De George talked, Holt had a conversation with Bright about the possibility of stealing some groceries from Troia's Market for Bright. Holt had burglarized the store on previous occasions and sold the groceries for half the original price.

De George and Holt left Bright's and drove to Monterey. While they were driving, De George stated he wanted to rob a gas station, but Holt refused to have anything to do with the idea. De George dropped Holt off at a friend's house in New Monterey. About 7 p.m. De George returned and picked him up. As they were driving, De George told Holt he would help Holt rob Troia's Market. De George drove around for about 10 minutes, then drove to the market. As they passed by the market, they noticed that it was closing. Holt testified that he did not have a weapon and did not know if De George had a weapon. He planned to slip into the market through a window on the roof. He stated that he had done this several times in the past with an accomplice. De George was to drive his car around the back of the market to pick up the groceries after Holt had signaled to him.

When they saw the Troia brothers leave, they walked to a position behind the bottle room in the rear of the store. As they stood there, they observed Anthony Troia get into his red truck. De George went after Anthony Troia. Holt asked De George "What the hell are you doing?" but De George ignored him and ran around the bottle room and saw Sam Troia about to enter his car. De George then either hit Sam Troia or reached around him and attempted to snatch something. Troia turned around and said "What the hell's going on?" There was a yellow flash, a loud noise, and Troia fell to

---

[4]Holt and another prisoner were being transported from a new jail building for court proceedings at an old jail. When two jail matrons were taking prisoners back from court to the new jail, they were attacked by Holt and the other prisoner and locked in a cell. Both Holt and the other prisoner were apprehended still dressed in jail clothing.

the ground. De George bent over Troia and picked up the money. Troia said, "You son of a bitch. You didn't have to shoot me." Holt stood immobile for five to ten seconds; he saw Troia get up and fall against the car door. Holt did not know what to do; he walked over, looked down at Troia, then ran to De George's car which was parked on the corner. They drove off. They drove to a gas station and then to Seaside to Bright's house. Holt drove because De George was too nervous. De George told Holt they had to wait for James in order to give James back his gun. They remained at Bright's house for about an hour and a half. They counted the money and gave Bright certain articles of clothing and the money bags to burn. Holt did not want any of the money, but De George persuaded him to take some. After they had been at Bright's house for 20 minutes, James returned and Holt saw De George give James a weapon.

Holt and De George left Bright's and went to a friend's house. They arrived about 9:30 to 10 p.m. They heard a news broadcast about the Troia robbery and shooting; Holt called his sister who informed him that De George's wife wanted him to come home. De George left and came back about 10:30 p.m. to pick up Holt.

Holt also testified that he met McGowan when they were in jail and that he had talked to McGowan. Holt did not talk to McGowan about any details of the robbery/murder of Troia; he did not discuss any weapons and he did not say that he had shot Troia.

As noted, Holt was found guilty of one count of first degree murder with the use of a firearm and one count of robbery with the use of a firearm. The jury also found true, as a special circumstance, that the murder was committed while Holt was engaged in or was an accomplice in the commission or attempted commission of a robbery. After presentation of evidence at the penalty phase of Holt's trial, the jury imposed the death penalty.

Holt attacks all phases of the trial; however, because we conclude that several of his guilt phase contentions have merit and that he was prejudiced as far as the conviction of first degree murder is concerned, we do not reach his claims relating to the penalty phase.

## II

Holt raises two contentions regarding the manner in which his jury was selected and impaneled which must first be addressed.[5]

---

[5]Holt also raises a number of contentions with regard to his motion for a change of venue. We do not reach these claims. On retrial the circumstances will have changed and a motion for a change of venue will have to be considered in light of those circumstances.

■ First, he contends that the removal of persons opposed to the death penalty (see *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 885 S.Ct. 1770]) from the guilt phase of a capital trial, denies a defendant his right to a jury representative of a fair cross-section of the community. This issue was addressed in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. We held that the exclusion of persons who would automatically vote against death at the penalty phase of a capital case did not violate constitutional precepts.

■ Holt also asserts that the voir dire of each prospective juror regarding "death qualification" should have been done individually and in sequestration. In *People* v. *Hovey* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], we held that in future capital cases this procedure must be followed in order to minimize the potentially prejudicial effects of open voir dire. *Hovey,* however, was prospective only and therefore does not apply to this trial which started in 1979.

### III

Holt claims that numerous evidentiary errors occurred during the guilt phase of his trial and that these errors had a cumulative prejudicial effect.

We agree. Before discussing particular claims, it is well to point out the factual context in which the case was tried: while neither Holt nor De George made themselves out as blameless victims of circumstances, as far as the most serious charge of murder is concerned, each pointed to the other as the sole perpetrator. Although there was a certain amount of corroborating evidence, none—except Holt's statement to McGowan—really supported either Holt's or De George's version. What it came down to, therefore, was a one-on-one credibility contest between Holt and De George. This posture of the case clearly enhanced the potential for prejudice of any error that adversely affected the credibility of Holt.

### A. *Evidence of Holt's Drug Use*

■ During the direct testimony of De George, defense counsel made an anticipatory objection to any testimony that after the Troia shooting Holt purchased and used drugs. The prosecution asserted that the evidence was relevant to show motive. The trial court overruled the objection. De George then testified that with the proceeds of the robbery Holt purchased heroin from Bright and "fixed." Another prosecution witness was permitted to testify that he too saw Holt fix with heroin after the robbery/murder. During cross-examination of Holt, the prosecution attempted to establish that Holt had a heroin habit.

"The rule applicable here is that evidence of an accused's narcotics addiction is inadmissible where it 'tends only remotely or to an insignificant degree to prove a material fact in the case . . . .' " *(People* v. *Cardenas* (1982) 31 Cal.3d 897, 906 [184 Cal.Rptr. 165, 647 P.2d 569] [citing *People* v. *Davis* (1965) 233 Cal.App.2d 156, 161 (43 Cal.Rptr. 357)].) As we stated in *Cardenas, supra,* the cases which have upheld admission of evidence of an accused's drug addiction involved crimes where obtaining narcotics was the direct object of the crime or where a violation of Health and Safety Code was charged. In cases where the object of the offense was to obtain money for drugs, as the prosecution alleges in this case, evidence of the accused's drug use has been found to be inadmissible. *(People* v. *Cardenas, supra,* 31 Cal.3d at p. 906 and cases cited therein.)

Since De George had already testified that he and Holt had split the proceeds from the robbery, whatever minimal probative value there was in the additional testimony that Holt used his share to purchase and then use drugs was outweighed by the inflammatory effect of this testimony on the jury. As we noted in *Cardenas,* "[t]he impact of narcotics addiction evidence 'upon a jury of laymen [is] catastrophic . . . . It cannot be doubted that the public generally is influenced with the seriousness of the narcotics problem . . . and has been taught to loathe those who have anything to do with illegal narcotics in any form or to any extent.' " *(People* v. *Cardenas, supra,* 31 Cal.3d at p. 907, citing *People* v. *Davis* (1965) 233 Cal.App.2d 156, 161 [43 Cal.Rptr. 357].) Admission of the testimony concerning Holt's drug use was improper.

## B. *Evidence of Holt's Prior Crimes with De George*

■ During cross-examination of Holt, the prosecutor asked him whether he and De George had committed numerous burglaries together. Defense counsel objected to the evidence of other crimes absent a showing of relevance. The trial court overruled the objection on the basis that the testimony established a prior relationship between Holt and De George. Holt then admitted having "pulled" four or five burglaries with De George.[6]

"The admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact." *(People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883].) The "admission of this evidence produces an 'over-strong tendency to believe the defendant guilty of the

---

[6]The prosecution appeared to suggest Holt had committed more burglaries than he admitted: "Q. Isn't it true that you and De George had pulled numerous burglaries in the weeks and months before the Troia incident? [¶] A. Maybe four or five. [¶] Q. Maybe 40 or 50? [¶] A. No."

charge merely because he is a likely person to do such acts' (Wigmore, Evidence, § 194, p. 650)." (*Id.*, at p. 317.) ■ For this reason, evidence of prior specific acts of misconduct is ordinarily inadmissible to attack a witness' credibility. (*People* v. *Anderson* (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235].) Even where such evidence is relevant for other purposes, and not offered to prove conduct or attack credibility, evidence of other crimes "contains within itself a substantial degree of prejudice [and] should be received with 'extreme caution,' its admissibility 'examined with care,' and in the event of uncertainty as to its connection with the offense charged 'the doubt should be resolved in favor of the accused.' [Citation.]" (*Id.*, at p. 651.)

The relationship between De George and Holt was never in issue. There was no dispute concerning the fact that they knew each other or that they were together on the night of Troia's death. ■ "If an accused has not 'actually placed that fact in issue,' evidence of uncharged offenses may not be admitted to prove it." (*Thompson, supra,* 27 Cal.3d at p. 315.) Such evidence must be excluded under Evidence Code section 1101 because the only inference it directly seeks to establish is one of propensity to commit crimes in general. (*Thompson, supra,* at p. 317.)

■ Even assuming that the evidence was relevant to show the relationship between De George and Holt, the trial court did not examine its admissibility with care or with "extreme caution," but merely stated: "Well, we could have an offer of proof, but actually, so far as the relationship here is concerned, I think he [the prosecutor] can ask it." The trial court clearly erred. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1, 23-26 [164 Cal.Rptr. 1, 609 P.2d 468].)

## C. *Evidence of Prior Felony Convictions*

Holt had eight prior convictions and pursuant to Evidence Code section 352 and *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], he moved to restrict the prosecution's use of these convictions for impeachment purposes. The trial court ruled that five prior convictions were admissible: (1) a 1979 conviction of receiving stolen property, (2) a 1974 conviction of burglary, (3) a 1974 conviction of sale of a nonnarcotic in lieu of a narcotic, (4) a 1977 conviction of burglary, and (5) the 1979 conviction of escape. (See fn. 4, *ante,* p. 447, and accompanying text.)

■ ■ ■ ■ Holt contends that the trial court erred in (1) permitting impeachment with more than one prior felony conviction; (2) allowing impeachment without exercising its discretion by weighing the prejudicial effect of the additional priors against their probative value; (3) permitting

impeachment with evidence of two prior burglaries without any showing that either crime was the type of burglary that involved theft or a dishonest act; (4) permitting impeachment with what proved to be three prior escape convictions; and (5) permitting use of the 1974 "sale in lieu" conviction because that conviction was a misdemeanor.[7] All of these contentions essentially go to the adequacy of the trial court's exercise of discretion under *Beagle* and *People* v. *Green, supra,* 27 Cal.3d at pages 23-26. We examine them under the law in force at the time of the crimes. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)

As an umbrella claim, defendant asserts that the use of *one* prior offense is adequate for impeachment purposes. He points to *People* v. *Jardine* (1981) 116 Cal.App.3d 907 [172 Cal.Rptr. 408], for support. In *Jardine,* the Court of Appeal held that it was an abuse of discretion for the trial court to allow proof of more than one prior felony because the use of one prior offense was adequate to impeach. (*Jardine, supra,* at p. 916.) However, in *People* v. *Duran* (1983) 140 Cal.App.3d 485, 499 [189 Cal.Rptr. 595], another Court of Appeal noted that the *Jardine* court had cited "no authority for the implicit assumption that one felony is the limit when the issue is credibility." The *Duran* court found that it was not an abuse of discretion to allow proof of more than one felony. "A series of crimes relevant to character for truthfulness is more probative of credibility than a single lapse, and the trial court must weigh against that value the danger of prejudice." (*Duran, supra,* at p. 500.)

In *Beagle,* we held that a trial court may admit or exclude evidence of a prior felony conviction offered to impeach a witness after balancing four factors: (1) whether the conviction reflects adversely on the defendant's honesty or veracity; (2) whether the conviction is near or remote in time; (3) whether the conviction is for substantially similar conduct for which the accused is on trial; and (4) the effect if the defendant does not testify out of fear of being prejudiced by impeachment by prior convictions. (*Beagle, supra,* 6 Cal.3d at p. 453.) The court must weigh the first two factors "against the probability that admission of such evidence 'will (a) necessitate

---

[7]Holt asserts that the conviction for "sale in lieu," a violation of Health and Safety Code section 11355, was inadmissible for impeachment purposes because the conviction was a misdemeanor, not a felony (*People* v. *Banks* (1959) 53 Cal.2d 370 [1 Cal.Rptr. 669, 348 P.2d 102]; *People* v. *Hamilton* (1948) 33 Cal.2d 45 [198 P.2d 873]). Holt failed to object below and this evidentiary issue is therefore not available on appeal. Incidentally, the crime proscribed by section 11355 is a "wobbler"—it carries alternative prison and county jail punishment. By operation of Penal Code section 17, subdivision (b)(1), the conviction becomes a misdemeanor "for all purposes" which includes impeachment if a punishment other than imprisonment in state prison is imposed. Holt was sent to the California Rehabilitation Center for participation in a civil addicts program, but was eventually excluded. He was then sentenced to one year in the county jail for the section 11355 violation.

undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or misleading the jury.' ([Evid. Code,] § 352.)" (*People* v. *Fries* (1979) 24 Cal.3d 222, 227 [155 Cal.Rptr. 194, 594 P.2d 19].) In *Beagle* we did not address the issue of whether more than one prior felony was inadmissible. ▆▆▆ However, we now hold that the *Duran* court correctly reflects the proper approach. Whether or not more than one prior felony is to be admitted for the purpose of impeachment is simply one of the factors which must be weighed against the danger of prejudice. This is the test we enunciated in *People* v. *Green, supra,* 27 Cal.3d at page 26, for the admission of testimony challenged under Evidence Code section 352—the trial court must exercise its discretion and determine that the risk of undue prejudice does not substantially outweigh the probative value of the evidence.

Applying this test we find that it does not sufficiently appear that the trial court weighed the probative value of using more than one prior conviction against the prejudicial effect of such evidence. Although *Green* does not require that the trial court engage in an on-the-record evaluation of the factors affecting the weighing process, it does require that "the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value" (*Green, supra,* at p. 25). To make such a showing it may be sufficient if the court simply recites that its conclusion was the result of a weighing process. In this case, however, the record does not even contain such a recital.

Holt also challenges the admission of two burglary priors without any showing that the burglary convictions involved theft or a dishonest act.[8]

In *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74], we examined the issue of determining which felony convictions affect credibility for impeachment purposes. We stated "[o]nly a conviction which has as a necessary element an intent to deceive, defraud, lie, steal, etc., impacts on the credibility of a witness." (*Id.,* at p. 115.) Holt was convicted of burglary (§ 459)—which requires an intent to commit any felony or grand or petit larceny as a necessary element. ▆▆▆ A conviction for burglary does not therefore necessarily involve an intent to deceive, defraud, lie, steal, etc. It would only be relevant to credibility if it involved an intent to commit theft or some other dishonest act. (See *People* v. *Keating* (1981) 118 Cal.App.3d 172, 179-180 [173 Cal.Rptr. 286].)

---

[8]It must be noted that Holt failed to object on this ground and arguably the failure to object below constitutes a waiver of the claim on appeal. (*People* v. *Lescallett* (1981) 123 Cal.App.3d 487, 493 [176 Cal.Rptr. 687].)

In this case, the prosecution made no showing that either conviction for burglary involved theft and the trial court simply stated "that [a burglary conviction] would normally be admissible."[9] In these circumstances, however, without deciding whether the prosecution was required to make a showing, we find that the trial court erroneously admitted the prior burglary convictions. Again, the court made no attempt to weigh the risk of undue prejudice against the probative value of the evidence of prior burglary convictions—it simply admitted the evidence because it would "normally be admissible." This is not the type of balancing which our decisions in *Beagle* and *Green* envisioned.

Holt also contests the admission of three prior escape convictions. The trial court ruled that only one escape conviction—the most recent—was admissible because the underlying facts had previously been ruled admissible as showing consciousness of guilt. A 1977 conviction of escape was ruled out unless the People could produce a case holding that such evidence was admissible.[10]

Unfortunately matters got out of hand. On direct examination, defense counsel questioned Holt about his escape attempt—perhaps to establish that Holt was not motivated by consciousness of guilt: "Q: What's the reason you escaped? [¶] A: Well, there's no reason for my escape. *I escaped before that so there's no reason for the other escapes either.* I just escaped. That's all." (Italics added.) On cross-examination, over defense objection, the prosecution was permitted to enlarge on this remark by developing the actual facts of the defendant's 1977 escape, as distinguished from the mere fact that there had been a conviction. The People concede that during closing arguments, the prosecutor made improper reference to this escape as a sixth felony conviction which could be considered by the jury for impeachment purposes. During the cross-examination the prosecutor also brought out the fact of a previously unmentioned 1974 misdemeanor escape conviction.

The admission of Holt's 1979 escape led, therefore, to the improper use of other convictions for impeachment purposes. Escape does not involve

---

[9]The issue of whether, at least until the passage of article I, section 28, subdivision (f) of the California Constitution, the prosecution was required to show that a conviction for burglary involved theft, has divided lower courts. (See *People* v. *Keating* (1981) 118 Cal.App.3d 172 [173 Cal.Rptr. 286]; *People* v. *McCullough* (1979) 100 Cal.App.3d 169, 177 [160 Cal.Rptr. 831] [proponent of evidence of prior felonies has burden of showing burglary involved intent to commit theft or some other dishonest act]; *contra People* v. *Bishop* (1982) 132 Cal.App.3d 717, 721-722 [183 Cal.Rptr. 414]; *People* v. *Lescallet* (1981) 123 Cal.App.3d 487, 493 [176 Cal.Rptr. 687]; *People* v. *Benton* (1979) 100 Cal.App.3d 92, 97 [161 Cal.Rptr. 12] [burden on defendant to demonstrate prior conviction did not involve theft]).

[10]The People did not produce such a case.

"an intent to deceive, defraud, lie, steal, etc." as a necessary element and therefore does not impact on a witness' credibility. ■ ■ ■ ■ Although, a defendant's escape attempt can be used to show consciousness of guilt (see *People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961]), Holt's 1979 venture should have been limited to this purpose.[11]

## D. *Evidence of Knowledge of Prison Gangs*

■ On cross-examination of Holt, the People questioned him as to his familiarity with prison gangs such as the Nuestra Familia, the Mexican Mafia and the Black Guerilla Family. Holt was also questioned concerning the membership of F. A. Bright in the Black Guerilla Family and that of Joe Gonzales—a defense witness—in the Nuestra Familia.[12] Holt asserts that the prosecution should not have been permitted to interject the subject of prison gangs into the case, that such evidence is highly inflammatory and can only be admitted where the probative value of the evidence outweighs its prejudicial effect.

First, it should be noted that the People did not interject the subject of prison gangs into the case. The record reveals that on cross-examination of prosecution witness McGowan, defense counsel, over objection, elicited testimony that Holt had told McGowan that he had obtained the guns for the robbery from members of the Aryan Brotherhood—a white supremacist prison gang. On direct testimony Holt denied this statement, but acknowledged he was familiar with the Aryan Brotherhood as a prison gang. On cross-examination, the prosecutor questioned Holt as to his familiarity with other prison gangs, which was arguably a permissible subject for cross-examination. (Evid. Code, § 773.) However, the prosecutor then proceeded

---

[11]Holt makes an additional contention with regard to the 1979 escape, namely that the prosecution should not have been allowed to show that in his escape from custody while awaiting trial he committed the separate crime of battery on a peace officer. Evidence of escape is admissible to show consciousness of guilt (*People* v. *Terry, supra,* 2 Cal.3d 362) and it is permissible to admit evidence of violence during escape (cf. *People* v. *Dabb* (1948) 32 Cal.2d 491, 500 [197 P.2d 1]). Such evidence shows all the facts attending the escape, to either increase or decrease the probative force of the escape. (*People* v. *Hall* (1926) 199 Cal. 451, 460 [249 P. 859].) It should be acknowledged, however, that evidence of force and/or injury during an escape could easily have a prejudicial effect which outweighs any probative value. If the defendant therefore objects on the basis of Evidence Code section 352, the trial court should make an explicit determination whether the risk of undue prejudice outweighs the probative value of such evidence. (*People* v. *Green, supra,* 27 Cal.3d 1, 26.)

The record reveals that the trial court made such a determination—it considered the prejudicial effect of the testimony of the peace officer and limited the testimony. Under these circumstances, it was not error to allow the testimony.

[12]When Holt stated that Joe Gonzales was not a member of Nuestra Familia, the prosecution stated that Gonzales was not only a member but the "general" of Nuestra Familia.

to question Holt about the membership of Bright and Gonzales in prison gangs. Defense counsel's objection on the basis of relevancy was overruled and the trial court held that the prosecutor could question Holt as to the associations of "another party involved here in some way." That ruling is indeed hard to justify.

A witness may be cross-examined about the group membership he shares with a party to the action, "such common membership is a factor that tends to impeach a witness' testimony by establishing bias." (*In re Wing Y.* (1977) 67 Cal.App.3d 69, 76 [136 Cal.Rptr. 390].) In this case, however, there was no showing that Holt was a member of any gang or that he shared common membership with any party to the action. No such showing of common membership could be made—Bright and Gonzales were not parties. The evidence, therefore, had no probative value other than to blacken the character of Holt's associates.

## IV

Holt makes two additional contentions which we believe have merit: (1) the trial court erred in permitting a defense witness to be improperly impeached and (2) the prosecutor committed prejudicial misconduct in his closing argument.

### A. *Impeachment of Defense Witness*

Joe Gonzales, a defense witness, testified that while he was in Monterey County jail, De George informed him that he, De George, had shot Troia. On cross-examination, the prosecutor brought out that Gonzales had been convicted of murder and armed robbery in 1966 and had been sentenced to death, and that Gonzales had also been convicted of three counts of murder and conspiracy to commit murder in 1979.[13] Holt contends that the trial court erred in permitting Gonzales to be impeached with prior felony convictions other than the 1966 robbery.

In *People* v. *Woodard* (1979) 23 Cal.3d 329 [152 Cal.Rptr. 536, 590 P.2d 391], we held that no witness could be impeached with a prior felony conviction unless the conviction had some probative value on the issue of truthfulness. (*Id.,* at p. 335.) In *Woodard,* we also concluded that a witness could not be impeached with a prior voluntary manslaughter conviction: "the voluntary manslaughter conviction established the commission of a

---

[13]Holt also objects to the fact that the prosecutor referred to the witness as Death Row Joe. The trial court permitted the prosecutor to ask defendant if he knew the witness as Death Row Joe on the basis that it identified the witness. The justification sounds labored.

violent act, which may, at the most, have indicated a character trait for violence." (*Id.*, at p. 340.) While Gonzales' four murder convictions—plus three for conspiracy to commit murder—definitely establish the commission of a number of plans and acts which indicate a character trait for violence, the evidence does not show that Gonzales was disposed to falsify. The evidence had no probative value on the issue of truthfulness and should therefore have been excluded.

## B. *Prosecutorial Misconduct in Closing Argument*

 In the closing argument in the guilt phase, defense counsel discussed the range of possible verdicts available to the jury. Counsel pointed out that if the jury believed Holt's testimony that he only intended to burglarize Troia's Market and if they found that he had progressed beyond mere preparation, they might return a first degree murder verdict based on an attempted burglary felony-murder theory. The prosecutor, in his rebuttal argument, stated that if the jury accepted the defense theory, they would be guaranteeing defendant a parole date.[14] Defense counsel objected to this argument as improperly referring to the penalty. The trial court instructed the prosecutor not to talk about the parole date. Holt contends that the prosecutor committed prejudicial misconduct by injecting the question of punishment into the jury deliberations and that the prosecutor

---

[14]The prosecutor argued as follows: "The defense has suggested to you, ladies and gentlemen, Mr. Howell got up here last Thursday and said there is sufficient evidence to convict Mr. Holt of first degree murder on the theory that he killed someone during the commission of a burglary. There is only sufficient evidence of that, ladies and gentlemen, if you believe Steven Holt. [¶] Now I ask each of you without answering me right now, did you believe Steven Holt? When he took the stand and testified, did you believe what he had to say? I want to discuss that. I want to discuss right now what I believe to be the crux of this case. Was it a burglary or was it a robbery? Let's analyze the evidence, ladies and gentlemen. [¶] And the reason I suggest to you that you should be extremely skeptical, one of the reasons about whether or not this was a robbery or a burglary—excuse me—is that: Mr. Howell stood up here and told you to discount the testimony of Juan de George because he's a puppet for the DA; he got his plea and now he has a parole date and, therefore, he's not to be believed. What do you think Steven Holt is doing here? Why do you think he got up here and told you that it was a burglary knowing that his attorney was going to get up here and tell you, 'My client is guilty of murder in the first degree because it was a murder during a burglary'? [¶] You remember I told you last week to beware of people bearing gifts, *what happens if you conclude that this was a burglary. You know what happens? You give Steven Holt a parole date.* That's the answer, ladies and gentlemen. You might say to yourself, 'Good Lord, what's wrong with the DA? He's talking about horses all the time.' What about the old saying 'Don't look a gift horse in the mouth'? Well, you look this one in the mouth, ladies and gentlemen, and you count the teeth and you analyze this gift horse and you're going to find out that it's not a gift horse at all, that it's a sham *because if you find that Steven Holt is guilty of first degree murder based on a burglary theory, then you cannot conclude that the murder occurred during a robbery and if you cannot conclude that it occurred during a robbery, you've just guaranteed him a parole date.*" (Italics added.)

misstated the law in explaining the legal effect of a special circumstances finding.[15]

 A defendant's possible punishment is not a proper matter for jury consideration. (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 157, fn. 4 [141 Cal.Rptr. 698, 570 P.2d 1050].) "[T]he jury is not allowed to weigh the possibility of parole or pardon in determining the guilt of the defendant . . . ." (*People* v. *Barclay* (1953) 40 Cal.2d 146, 158 [252 P.2d 321].) An admonishment to the jury that they were not to consider the question of penalty might have had a curative effect. However, no admonishment was given. As noted the trial court merely stated: "I wouldn't talk any more about that."

While the jury was instructed at the conclusion of the guilt phase that the subject of penalty or punishment was not to be discussed and must not affect the verdict[16] the instruction did not negate the improper reference to punishment by the prosecutor.

In sum, the trial court improperly: (1) permitted Holt to be portrayed as a drug abuser, (2) allowed evidence of prior burglaries Holt had committed with De George, (3) permitted impeachment of Holt without weighing the prejudicial effect against the probative value, (4) allowed impeachment with felonies not shown to involve lack of veracity, (5) permitted evidence of an escape which had no probative value whatever, (6) permitted the prosecution to introduce evidence that Holt's associates were members of prison gangs, (7) permitted a defense witness to be improperly impeached, and finally, (8) permitted the prosecutor to argue the effect of a certain finding on Holt's punishment.

## V

 We must decide whether the erroneously admitted evidence, the improper impeachment and prosecutorial misconduct constituted prejudicial error, requiring reversal of the judgment. The test as enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] is whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

---

[15]Although the prosecutor's suggestion was misleading because a person convicted of first degree murder is not automatically eligible for release on parole (see §§ 190, 3041, subd. (b), 3046), the contention that the prosecutor misstated the law is not available to defendant on appeal. This point was not raised below. A timely objection and admonishment would have cured the harm (*People* v. *Green, supra,* 27 Cal.3d 1, 34-35).

[16]"In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance[s] charged in this case." (CALJIC No. 8.83.2.)

The evidence against the defendant consisted primarily of the testimony of De George, contradicted in all vital respects by Holt. The question of guilt depended to a large extent on the jury's determination of Holt's credibility vis-à-vis that of De George. (See *People* v. *Wagner* (1975) 13 Cal.3d 612, 621 [119 Cal.Rptr. 457, 532 P.2d 105]; *People* v. *Taylor* (1982) 31 Cal.3d 488, 500-501 [183 Cal.Rptr. 64, 645 P.2d 115].)[17]

The erroneously admitted evidence portrayed defendant as a drug abuser, an often-convicted felon with a history of unpunished crimes, a person with a propensity for crime and an associate of criminals. While there was no way to make Holt appear as anything but a crook, even he was entitled to rules of evidence which keep prejudice in bounds. The improper evidence effectively destroyed whatever credibility Holt had. The prosecutor made extensive use of this evidence in his argument to the jury.[18] Under these circumstances we cannot say that the impact on the jury was so insignificant that the errors were harmless.

In addition, the effect of the impermissible evidence was compounded by the improper impeachment of Holt's witness and the improper suggestion to the jurors by the prosecutor that, if they accepted Holt's version of the facts, they would be guaranteeing him a parole date. Holt was therefore additionally portrayed as a person who associated with convicted murderers and prison gang leaders and as a person who would escape his "just" punishment. It is reasonably probable that in the absence of the cumulative effect of these errors the jury would have reached a result more favorable to him. For this reason, we set aside the convictions for murder and robbery.

The judgment is reversed.

Broussard, J., Reynoso, J., Grodin, J., and Brown (G. A.), J.,* concurred.

**BIRD, C. J.**—I concur in the result. I write separately for two reasons. First, I cannot endorse the holding of *People* v. *Duran* (1983) 140 Cal.App.3d 485, 500 [189 Cal.Rptr. 595], that a court may properly admit

---

[17]The prosecutor acknowledged this in his closing argument to the jury stating: "You must decide 'do you believe the testimony of Steven Vincent Holt' or 'do you believe the testimony of Juan Eduardo de George' because, ladies and gentlemen, other than Sam Troia, those are the only two people that were at the scene that night. That's the decision you have to make."

[18]The prosecutor referred to Holt's drug use a number of times in closing argument, stating for example, "That's what Sam Troia died for, cocaine and heroin, ladies and gentlemen, and that's the motive."

*Assigned by the Chairperson of the Judicial Council.

more than one prior felony conviction to impeach a witness' credibility. Second, I disagree with the majority's holding that the removal of persons opposed to the death penalty did not deprive appellant of a representative jury. (See my dissenting opinion in *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680].)

The trial court's admission of five prior convictions here was erroneous, since the court failed to weigh the prejudicial effect of four of these priors against whatever probative value they might have had. (Evid. Code, § 352,[1] see maj. opn., *ante*, at pp. 457-458.) The dictum found in the majority opinion that such cumulative evidence *could* properly have been admitted, had the court followed the requisite section 352 weighing process, is incorrect.

Well-established precedent from this court is contrary to the majority's view. "By now it should be clear to all that when a defendant makes a timely objection to the introduction of evidence of a prior felony conviction for the purpose of impeaching his testimony, the trial court is under a duty (1) to determine the probative value of that evidence on the issue of the defendant's credibility as a witness, (2) to appraise the degree of prejudice which the defendant would suffer from admission of the evidence, and (3) to weigh the foregoing two factors against each other and exclude the evidence 'if its probative value [on the issue of credibility] is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, . . .' (Evid. Code, § 352)." (*People v. Rollo* (1977) 20 Cal.3d 109, 116 [141 Cal.Rptr. 177, 569 P.2d 771], brackets in original.)

Multiple prior felony convictions carry little, if any, additional probative value in determining the credibility of a witness. Under the criteria set forth in *People v. Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1], and its progeny (see, e.g., *People v. Spearman* (1979) 25 Cal.3d 107, 113-116 [157 Cal.Rptr. 883, 599 P.2d 74]; *People v. Woodard* (1979) 23 Cal.3d 329, 340-341 [152 Cal.Rptr. 536, 590 P.2d 391]) one recent prior is sufficient under section 788 to determine credibility. The witness should be stripped of any "false aura of veracity" (*People v. Beagle, supra,* 6 Cal.3d at p. 453) and the jury should be informed that the witness has already compromised honesty to the extent of incurring a felony conviction for dishonest conduct.

Cumulative priors have great potential for prejudice and for "confusing the issues, or . . . misleading the jury." (§ 352.) This court has repeatedly pointed out that even with a single prior, "there is a widely acknowledged

---

[1]All statutory references are to the Evidence Code unless otherwise noted.

danger that this evidence will be misused by the trier of fact. 'Despite limiting instructions, the jury is likely to consider this evidence for the improper purpose of determining whether the accused is the type of person who would engage in criminal activity.' [Citation.] As the United States Supreme Court has noted in a related context, evidence of a 'defendant's prior trouble with the law . . . is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.' [Citation.] This tendency to prejudge the issue of guilt denies an accused the presumption of innocence and lessens the burden of the prosecutor to prove guilt beyond a reasonable doubt." (*People* v. *Fries* (1979) 24 Cal.3d 222, 227-228 [155 Cal.Rptr. 194, 594 P.2d 19], fn. omitted.)

When a jury is told about more than one prior, the danger of confusion and prejudice is all the greater. In *People* v. *Jardine* (1981) 116 Cal.App.3d 907 [172 Cal.Rptr. 408], the court strongly suggested that only one prior should be admitted for this purpose under section 352. "Allowing one prior offense to be used would have been adequate to impeach [the accused's] character if such impeachment was to be allowed at all under the *Rollo* [*People* v. *Rollo, supra,* 20 Cal.3d at p. 116] standard. By ruling that all three priors would be available for impeachment, the trial court apparently did not take into account the degree of prejudice that [the accused] would suffer from admission of the evidence. If the trial court came to the conclusion that appellant's criminal activity was like a wheel turning it is not unlikely that the jury could and would come to the same conclusion, and the presumption of innocence would be seriously eroded." (*People* v. *Jardine, supra,* 116 Cal.App.3d at p. 916.)

The majority rely on *People* v. *Duran, supra,* 140 Cal.App.3d 485, for the proposition that multiple priors are admissible to impeach credibility. However, in that opinion, the cumulative nature of a second prior and its magnified potential for prejudice and confusion of the issues were *never* even considered.

The *Duran* majority observed that "[a] series of crimes relevant to character for truthfulness is more probative of credibility than a single lapse . . . ." (*Duran, supra,* 140 Cal.App.3d at p. 500.) Yet evidence of even one recent lapse serves to "impeach [] [the accused's] credibility for all the purposes legitimately contemplated by Evidence Code section 788." (*Id.,* at p. 504 (dis. opn. of Rattigan, J.).) As noted above, this "single lapse" forces an accused to testify before the jury as one who had already suffered a felony conviction for his dishonesty. More than one prior is surely cumulative.

Furthermore, the prejudice and confusion of issues caused by informing a jury that an accused is a recidivist criminal was never considered in *Duran*. A jury so informed is likely to view the accused as "the type of person who would engage in criminal activity." (*People* v. *Antick* (1975) 15 Cal.3d 79, 97 [123 Cal.Rptr. 475, 539 P.2d 43].) Since "'[t]he prosecution has no right to present cumulative evidence which creates a substantial danger of undue prejudice . . .'" such results should not be encouraged. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569].)

Two other decisions from the *Duran* Court of Appeal are instructive. Both found it error to inform the jury of more than one prior conviction when the accused's credibility was in issue. *People* v. *Zimmerman* (1980) 102 Cal.App.3d 647 [161 Cal.Rptr. 669, 14 A.L.R.4th 214], and *People* v. *Morrison* (1977) 67 Cal.App.3d 425 [136 Cal.Rptr. 650] involved charges of possession of a firearm by an ex-felon. (Pen. Code, § 12021.) The prosecutor sought to impeach the accused's credibility with a prior felony conviction other than the conviction which established the "ex-felon" element of the new charge. In both cases, the court held that the prosecutor should have been required to use the same prior to establish the ex-felon element of the charged offense and to impeach the accused's credibility.

A single prior was found to be adequate for each purpose and more than one was held to be unnecessarily prejudicial. "By analogy to the procedure directed by the Supreme Court in *People* v. *Beagle, supra,* the trial court should have controlled the situation so as to give the prosecutor adequate scope to establish beyond question that there had been a prior conviction and, at the same time, to prevent unnecessary prejudice to the defense by proving more than one of the priors." (*People* v. *Morrison, supra,* 67 Cal.App.3d at p. 428, accord *People* v. *Zimmerman, supra,* 102 Cal.App.3d at p. 657, fn. 5.)

The majority's decision marks a retreat from *Beagle* and section 352 principles which forbid the use of more than one prior conviction to impeach credibility. Since *Duran* fails to apply these principles in any reasoned manner, I regret that this court has seen fit to endorse that inadequate decision.

**MOSK, J.**—I agree with the majority opinion that several errors were committed during the course of the trial. While not one of the errors alone would necessarily require reversal of the conviction and a retrial, cumulatively they add up to a serious question whether under *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error[s]."

On the other hand, this was a heinous offense, the participation of defendant was deliberate, and whether he or his confederate actually fired the fatal shot, the culpability of each for the armed robbery and its fatal consequences is manifest. There was a sufficiency of evidence for conviction. The issue, in doubt in my mind after the reversal proposed by the majority, is whether the evidence also supports a finding of special circumstances and imposition of the death penalty. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].)

This crime took place in February 1979, more than five and a half years ago. It would be remarkable if some witnesses have not disappeared and memories of others have not grown dim in the interim. While the interests of justice clearly prevent a dismissal after the majority's order for reversal—based on errors of law and not insufficiency of evidence—a retrial may be difficult after the passage of so many years.

Therefore, to achieve the *Watson* requirement of "a result more favorable" to defendant, and also to serve the ends of justice, I would exercise our statutory authority not to reverse the conviction and require a retrial, but to reduce the judgment to guilt of first degree murder and of robbery, without special circumstances, and remand to the trial court for resentencing. However, if the district attorney were to file with this court within 30 days of the issuance of the remittitur a declaration of his ability and desire to retry the case pursuant to the original charges, I would then join the majority in simply reversing the judgment.

The authority of this court to reduce a judgment in a criminal case is contained in Penal Code section 1260, which provides that on appeal the reviewing court may "reverse, affirm, or *modify* a judgment or order appealed from, or *reduce* . . . the punishment imposed, and may set aside, affirm or *modify* any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may . . . remand the cause to the trial court for such further proceedings as may be just under the circumstances." (Italics added.) (*People* v. *Schueren* (1973) 10 Cal.3d 553, 561 [111 Cal.Rptr. 129, 516 P.2d 833]; *People* v. *Odle* (1951) 37 Cal.2d 52, 57 [230 P.2d 345].)

There is also authority vested in appellate courts by Penal Code section 1181, subdivision 7. It provides that a trial court may modify a verdict "by imposing the lesser punishment without granting or ordering a new trial, and *this power shall extend to any court to which the case may be appealed.*" (Italics added.) Justice Peters and I advocated use of this section in our dissenting opinions in *People* v. *Mabry* (1969) 71 Cal.2d 430, 446-458 [78 Cal.Rptr. 655, 455 P.2d 759].

In *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898], this court found serious errors and misconduct committed by the trial court and the prosecutor, but since the overwhelming weight of credible evidence established guilt, the judgment was reversed with directions to the trial court to reduce a death penalty to life imprisonment. The majority relied on the miscarriage of justice section of the California Constitution (then § 4 ½, now § 13, of art. VI).

In a number of cases our predecessors on this court have eschewed exercise of the statutory authority clearly given by section 1260, but they have never provided a convincing rationale for doing so; rather they appear to adopt a summary rejection of that authority. (See, e.g., *People* v. *Howk* (1961) 56 Cal.2d 687, 700 [16 Cal.Rptr. 370, 365 P.2d 426]; *People* v. *Linden* (1959) 52 Cal.2d 1, 26 [338 P.2d 397]; *People* v. *Green* (1956) 47 Cal.2d 209, 235 [302 P.2d 307]; *People* v. *Carmen* (1954) 43 Cal.2d 342, 351 [273 P.2d 521]; *People* v. *Dessauer* (1952) 38 Cal.2d 547, 555 [241 P.2d 238]; *People* v. *Thomas* (1951) 37 Cal.2d 74, 77 [230 P.2d 351].) I would overrule the portions of the foregoing opinions that declare this court may not reduce punishment imposed in a criminal case.

There has been similar reluctance in the past to use section 1181, subdivision 7. In *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 327 [57 Cal.Rptr. 608, 425 P.2d 208], this court declared that only the trial court, not this court, may reduce punishment. The opinion relied on *People* v. *Mitchell* (1966) 63 Cal.2d 805, 821 [48 Cal.Rptr. 371, 409 P.2d 211]. In neither opinion, however, was there any discussion other than the conclusory statement in *Mitchell* that "This court has uniformly rejected requests to reduce the penalty from death to life imprisonment." There was no suggestion that the court lacked the power to so act. I would overrule the portions of *Lookadoo* and *Mitchell* that declare this court may not reduce punishment imposed in a criminal case.

While we should exercise this power with restraint, the authority to act in an appropriate case is clearly provided by law. This is such a case.