Filed 8/13/14  P. v. Duarte CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAICO G. DUARTE,<br><br>    Defendant and Appellant. | D065463<br><br><br>(Super. Ct. No. RIF1104077) |

APPEAL from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Affirmed as modified with directions.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L. Garland, Assistant Attorneys General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Maico G. Duarte of first degree murder of Martin Barbarin (Pen. Code,[1] § 187, subd. (a); count 1) and active participation in a criminal street gang.

---

[1]    All statutory references are to the Penal Code.

(§ 186.22, subd. (a); count 3.) It found true an allegation that Duarte personally used a deadly weapon in committing the murder. (§ 12022.53, subd. (d); count 2.) It acquitted Duarte of the charge of attempted murder of Gerald Galvan. (§§ 664, 187, subd. (a); count 2.) The court sentenced Duarte to 50 years to life as follows: 25 years to life each on the murder conviction and the firearm enhancement, and a concurrent two-year term on the gang conviction.

Duarte contends: (1) There was insufficient evidence that he killed Barbarin because the testimony of the principal witness to the murder, Donald Fimbres, regarding how the death occurred was physically impossible and, alternatively, Fimbres's testimony was not sufficiently corroborated; (2) the court erroneously instructed the jury that Fimbres was an accomplice; (3) by instructing the jury with CALCRIM No. 1400, the court erred by excluding the standard instruction's definition of the term "felonious criminal conduct"; (4) the court erred by instructing the jury about Galvan's refusal to testify at trial; (5) there was cumulative error; and (6) his count 3 sentence should be stayed under section 654. We find merit in only the last contention, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

*Nicole Diaz's Trial Testimony*

In April 2000, Nicole Diaz lived with Fimbres and her two children in Riverside, California. Duarte and his then girlfriend Patricia Valencia stayed with them briefly. Fimbres, Diaz, Duarte and Valencia used methamphetamines almost daily. In the days before the murder, Diaz learned that Fimbres and Duarte had tried purchasing approximately $700 worth of methamphetamines from someone who had kept the money without delivering the drugs. Approximately two days later, Fimbres told Diaz to take the children to the park because he

2

did not want them around while he talked to certain individuals about finding the drug dealer. Diaz left and Fimbres stayed behind with Duarte and Valencia. Diaz had seen Fimbres and Duarte with a handgun.

On April 13, 2000, at approximately midnight, someone arrived at the gate to Fimbres's house. He and Duarte went outside to meet the person. From inside the house, Diaz heard an argument and later gunshots coming from outside. When Fimbres returned inside, he did not have a gun. Fimbres's hand was bloodied; he said he needed to "get out" of there and left. Duarte and Valencia also left the house immediately. Minutes later, as Diaz was leaving the house, she saw a man lying in Fimbres's driveway. Diaz was taken to another house, where she was reunited with Fimbres. At daylight, Diaz and Fimbres moved to a different house, and later that day they went to live in Banning, California.

*Patricia Valencia's Trial Testimony*

At the time of trial, Valencia had been dating Duarte for more than 10 years and had two children with him. Valencia explained that in April 2000 she and Duarte sold methamphetamine and marijuana while they were staying at Fimbres's house. Valencia testified Duarte had belonged to a Riverside gang. She had seen Fimbres—but not Duarte— with a gun. That testimony contradicted what Valencia had told detectives in 2000: that she had also seen Duarte with an automatic gun. Valencia, Duarte and Fimbres pooled their money and Duarte gave Barbarin approximately $700 for him to buy drugs for them. On April 13, 2000, during daylight hours, Barbarin went to Fimbres's house and Fimbres and Duarte went outside to speak with him, closing the door behind them. After the meeting, Duarte told Valencia that Barbarin had failed to return the money or provide the drugs. Later that night,

3

Valencia heard a voice at the gate. Duarte and Fimbres went outside. Valencia stayed inside and heard an argument coming from outside. Shortly afterwards, Duarte entered the house and said, "We have to go." Duarte and Valencia left the house immediately. They passed Barbarin, who was lying on the ground and moaning. Valencia never called police or sought medical care for Barbarin. The next day, Duarte and Valencia moved to Indiana. When Valencia had asked Duarte about Barbarin's death, he told her to shut up because it was none of her business. Duarte never denied to Valencia that he had killed Barbarin.

*Donald Fimbres's Trial Testimony*

Fimbres testified under a grant of immunity that he had been a drug addict and met Duarte when he bought drugs from Duarte a few weeks before the murder. Approximately two days before the murder, while Duarte and Valencia were staying at Fimbres's house, Fimbres returned home and met Barbarin, who he had known from their childhood. Barbarin said he was going to buy drugs for Duarte. When Barbarin did not return with the drugs that evening, Fimbres and Duarte went looking for him without success. Approximately two days later, at around midnight, Barbarin went to Fimbres's house and Duarte and Fimbres met him outside. Barbarin asked them why they had spread the word that he was "burning the homies," and Fimbres responded that it was because Barbarin had not returned Duarte's money. Barbarin and Duarte fought and ended up wrestling on the ground. Fimbres tried to pull Barbarin off Duarte, when suddenly Barbarin fell limp. Fimbres saw Duarte with a gun in his hand and asked why he had shot Barbarin. Duarte replied something to the effect of, "Fuck that fool," adding, "He burned me." During the fight, Galvan was "in the background," closer to the street. Fimbres did not see any weapons on Barbarin or Galvan. Fimbres telephoned for

4

an ambulance, but due to his "ex-felon" status, he did not wait for police to arrive. Fimbres later learned Galvan had been shot in the incident.

*Police Investigation and Forensic Evidence*

Riverside Police Department Detective Joe Miera testified that Duarte, Fimbres, Barbarin and Galvan were members of the Eastside Rivas gang, whose primary activities included possession of firearms, assaults, murders, and narcotic sales—in particular—methamphetamine.

Forensic pathologist Mark Fajardo testified Barbarin died from three gunshot wounds, one of which pierced his carotid artery and went through his lung. Someone receiving those kinds of injuries likely would bleed to death after two minutes. If someone is shot at a close range of approximately two feet, the gunshot likely would leave stippling or gunshot powder body tattooing on the victim's body; however, no stippling was found on Barbarin's body. Based on Barbarin's wounds, he was shot at a downward angle. Barbarin's blood tested positive for alcohol, methamphetamine and marijuana.

DISCUSSION

I.

Duarte contends there was insufficient evidence to show that he, as opposed to Fimbres, was guilty of murdering Barbarin. Duarte points out that Fimbres's testimony regarding the angle and distance from which Barbarin was shot was inconsistent with the pathologist's testimony, and argues: "Because Fimbres's account of the shooting could not have physically occurred, his testimony must be disregarded, and without Fimbres's testimony claiming that

5

[Duarte] was the shooter, there was insufficient evidence to convict [Duarte] of the charged crimes."

The People, while conceding that "Fimbres probably lied" regarding how the shooting was carried out, nonetheless contend the evidence sufficed to sustain the convictions:  "The evidence apart from Fimbres's account of the actual shooting showed that [Duarte] and Fimbres had a reason to kill Barbarian [*sic*]; that they shared access to a gun; that they confronted Barbarian [*sic*] and verbally and physically fought with him; that Barbarian [*sic*] ended up dead of gunshot wounds; and that appellant and Fimbres both fled not only the scene, but the residence where they were staying."

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187.)  "Murder includes both actus reus and mens rea elements.  To satisfy the actus reus element of murder, an act of either the defendant *or an accomplice* must be the proximate cause of death."  (*People v. Concha* (2009) 47 Cal.4th 653, 660.)  "In short, a defendant may be liable for murder when he possesses the appropriate mens rea and either the defendant or an accomplice causes an unlawful death."  (*Ibid*.)

Neither mere "presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission.  [Citations.]  . . .  '[A]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)  " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' "  (*Ibid*.)

6

Because there is rarely direct evidence of a defendant's knowledge (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495) or intent (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690), these matters generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise.  (*People v. Smith* (2005) 37 Cal.4th 733, 741.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' "  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) As the California Supreme Court has explained, "[t]he aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own.  It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.)

"A person may aid and abet a criminal offense without having agreed to do so prior to the act.  [Citations.]  In fact, it is not necessary that the primary actor expressly communicate his criminal purpose to the defendant since that purpose may be apparent from the circumstances.  [Citations.]  Aiding and abetting may be committed 'on the spur of the

7

moment,' that is, as instantaneously as the criminal act itself." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532.)

Although we agree that Fimbres's testimony regarding the angle and distance of the shooter from the victim was inconsistent with that of the pathologist, we conclude that inconsistency and Fimbres's credibility on that point was for the jury to resolve. However, there still was separate substantial evidence from which the jury could reasonably infer Duarte had aided and abetted the murder of Barbarin. As Duarte concedes, "there was a monetary dispute between Fimbres, [Duarte], and Barbarian [*sic*], and Fimbres and [Duarte] had earlier gone to find Barbarian [*sic*] to sort out the dispute." That evidence established a possible motive for Duarte and Fimbres to confront Barbarin, who had failed to purchase the drugs for them or return the approximately $700 Duarte had given him. Further, Diaz testified she was excluded from a meeting Duarte and Fimbres held before the murder regarding Barbarin's failure to comply with his part of the drug deal. The jury reasonably could infer that the meeting's purpose was to address the harm Fimbres and Duarte would inflict on Barbarin in retribution for the drug deal gone bad. As noted, Valencia and Diaz testified about their seeing Fimbres and Duarte with guns in the days before the murder. Both Duarte and Fimbres met Barbarin outside Fimbres's house. Diaz and Valencia heard an argument coming from outside, and Diaz heard gunshots. The coroner testified Barbarin was killed by gunshots. Further evidence supporting Duarte's involvement is his postmurder conduct. He evinced consciousness of guilt by immediately leaving the crime scene and fleeing to Indiana. Despite the conflict in the testimony regarding how the shooting occurred, therefore, the record supports the conclusion that Duarte acted with " ' "guilty knowledge and intent with regard to

8

the commission of the crime," ' " as is required for accomplice liability. (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)

The crux of Duarte's argument is that the jury was required to believe either all or none of Fimbres's testimony. Specifically, Duarte argues, "If appellant did not shoot Barbarian [*sic*] while they were wrestling, or even fighting in close range while standing, then it is entirely unknown what the circumstances of the shooting were. There is no way to accept the part of Barbarian's testimony [*sic*] that supports the judgment and ignore the part that does not, because if one ignores the part of Barbarian's testimony [*sic*] that does not support the judgment, one is left with no account of what occurred."

However, California law is to the contrary: "The jury is the ultimate judge of credibility. The jury may find a witness is credible in some respects and not in others; it may believe parts of a witness's testimony without believing all of it." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029.) Here, the court's instruction with CALCRIM No. 226 was in accord: "You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." The instruction continues, "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

## II.

Claiming that the issue of whether Fimbres was an accomplice was a factual one for the jury to decide, Duarte contends the court should have instructed with CALCRIM No. 334

9

instead of erroneously instructing the jury with CALCRIM No. 335.[2]  We reject the contention.

A court minute order entry notes that the defense initially requested instruction with CALCRIM No. 334.  No explanation appears in the record regarding the court's decision to instead instruct the jury with CALCRIM No. 335.  However, during a subsequent proceeding outside of the jury's presence, defense counsel told the court he had no objections to the court's proposed jury instructions.

"An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  "This definition encompasses all principals to the crime [citation], including aiders and abetters and coconspirators."  (*People v. McLain* (1988) 46 Cal.3d 97, 106.)  "Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either

_____

2     The court instructed the jury with CALCRIM No. 335:  "A person is an accomplice if he is subject to prosecution for the identical crime charged against the defendant as either a perpetrator or as an aider and abettor.  In this case, the witness Donald Fimbres is an accomplice.  [¶]  You may not convict the defendant of murder or attempted murder based on the testimony of an accomplice alone.  You may use the testimony of an accomplice to convict the defendant only if:  [¶]  1. The accomplice's testimony is supported by other evidence that you believe; [¶]  2. That supporting evidence is independent of the accomplice's testimony [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes.  [¶]  Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.  [¶]  Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

10

the facts or the inferences to be drawn therefrom." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.)

Two instructions deal with the issue of accomplice testimony and the need for corroboration. One is given when the witness is an accomplice as a matter of law. (CALCRIM No. 335.) The other is given when there is a dispute as to whether the witness was an accomplice. (CALCRIM No. 334.) Both inform the jury it cannot convict the defendant based upon the testimony of an accomplice, absent other evidence—evidence independent of the witness's testimony—that tends to connect the defendant to the crime. Both also state the corroborating evidence may be slight and an accomplice's testimony should be viewed with caution. (CALCRIM Nos. 334, 335.) The difference is that CALCRIM No. 335 instructs the jury that a particular witness is an accomplice, while CALCRIM No. 334 defines an accomplice and places upon the defendant the burden of proving the witness was an accomplice.

We conclude the court did not err in determining that the following facts adduced at trial permitted only the one inference that Fimbres was an accomplice: Both Fimbres and Duarte had invested money in a drug deal with Barbarin. They therefore shared a motive in addressing Barbarin's failure to provide them the drugs or return their money. They both met to discuss their response to that situation and afterwards went looking for Barbarin. Fimbres and Duarte were seen with handguns in the days before the murder. When Barbarin went to Fimbres's house at around midnight, both men went outside to meet him. An argument ensued among them, gunshots were fired and Barbarin died as a result. Immediately afterwards, both Fimbres and Duarte fled the crime scene and Riverside.

11

However, even if the trial court had erred in instructing with CALCRIM No. 335, the error was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' " (*People v. Avila* (2006) 38 Cal.4th 491, 562-563.) The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, so long as it tends to implicate the defendant by relating to an act that is an element of the crime. (*People v. McDermott* (2002) 28 Cal.4th 946, 986.) The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies (*People v. Davis* (2005) 36 Cal.4th 510, 543) and need not establish every element of the charged offense (*McDermott*, at p. 986). The corroborating evidence is sufficient if, without aid from accomplice testimony, it " ' "tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." ' " (*Davis*, at p. 543.) Evidence establishing motive and opportunity may be sufficient to corroborate an accomplice's testimony. (*People v. Vu*, *supra*, 143 Cal.App.4th at p. 1022.)

As noted, Diaz and Valencia provided sufficient corroborating evidence to support Fimbres's testimony implicating Duarte in the first degree murder of Barbarin. It follows that, on this record, we also reject Duarte's alternative argument Fimbres's accomplice testimony was not corroborated as required by law. In any event, it is not reasonably probable that Duarte would have obtained a more favorable outcome if the court had instructed the jury with CALCRIM No. 334, which would have directed the jury that Fimbres was an accomplice, to regard his incriminating testimony with caution, and that such testimony required

12

corroboration.  CALCRIM No. 334 would have presented an additional hurdle for Duarte to overcome, because the jury would have first needed to decide if Fimbres was an accomplice.

III.

Regarding his count 3 conviction, Duarte contends the court prejudicially excluded from its instruction with CALCRIM No. 1400[3] a section of the standard instruction defining

---

[3]  The court instructed the jury with CALCRIM No. 1400 as follows:  "The defendant is charged in Count Three, with participating in a criminal street gang in violation of Penal Code section 186.22[, subdivision] (a).  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant actively participated in a criminal street gang; [¶]  2.  When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity;  [¶]  AND  [¶]  3.  The defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by:  [¶]  a.  directly and actively committing a felony offense; or  [¶]  b.  aiding and abetting a felony offense.  [¶]  Active participation means involvement with a criminal street gang in a way that is more than passive or in name only.  [¶]  The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang, or that he was an actual member of the gang.  [¶]  A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal:  [¶]  1.  That has a common name or common identifying sign or symbol;  [¶]  2. That has, as one or more of its primary activities, the commission of felonies;  [¶]  AND  [¶]  3.  Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.  [¶]  In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.  [¶]  A *pattern of criminal gang activity*, as used here, means:  [¶]  1.  The commission of two or more felonies;  [¶]  2.  At least one of those crimes was committed after September 26, 1988;  [¶]  3. The most recent crime occurred within three years of one of the earlier crimes;  [¶]  AND  4.  The crimes were committed on separate occasions or were personally committed by two or more persons.  [¶]  The People need not prove that every perpetrator involved in the pattern of criminal gang activity, if any, was a member of the alleged criminal street gang at the time when such activity was taking place.  [¶]  The crimes, if any, that establish a pattern of criminal gang activity, need not be gang-related.  [¶]  If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved.  [¶]  You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed."

13

the term "felonious criminal conduct."  He specifically argues, "Without a definition of 'felonious criminal conduct' and an identification of the target felony or felonies appellant allegedly aided and abetted, the jury was apt to believe that [he] could be found guilty of violating section 186.22, subdivision (a) merely by being a gang member since gangs, by definition, engage in criminal conduct."  He also claims the error was compounded by the People's closing argument regarding the crimes committed by the Eastside Rivas gang members.[4]

---

[4]     The prosecutor argued regarding the elements of section 186.22, subdivision (a):  "So what are the elements of this?  [Appellant] actively participated in Eastside Rivas. When he did so, he knew that the members engaged in or have engaged in a pattern of criminal activity.  And he willfully assisted, furthered or promoted felonious conduct by members of the gang, either by directly committing the offense or aiding and abetting a felony offense.  This isn't even really close.  I don't think there's gonna be much disagreement.  The defendant was actively participating in Eastside Rivas.  [¶]  This is why we have all of these photos here.  The house next door.  Not only do we see 'Eastside Rivas,' we see 'Eastside Rivas CLPS' graffiti on the wall.  CLPS is the defendant's clique.  It's right next door.  [¶]  April 13, 2000, 'Park Avenue, ESR CLPS.'  *This is what was taken inside the Park Avenue residence this night, the night that Martin Barbarian was killed,* when officers went inside.  This is the graffiti on the wall inside that residence, 'Eastside Rivas ESR.'  Both Donald Fimbres' moniker and the defendant's moniker, 'Trigger' and 'Babas.'  [¶]  We know that *at the time of this murder the defendant has 'SUR,' S-U-R representing he was a Surenos on his arm.*  And he also had this across his entire back, 'Eastside Rivas.'  *We know that's what he had at least at the time of the murder.*  And it's not as if all of this weren't enough to dissuade someone from being involved in this lifestyle, that's 2012.  He's embraced it, Ladies and Gentlemen.  That's what he's done.  Since 2000 he's embraced it.  Now you have far more Eastside Rivas tattoos.  [¶]  Gang tattoos in 2000, we just saw them.  He's member of an extremely violent gang.  He knows what this gang does.  All these guys do.  He's out there selling dope on Park Avenue to other Eastside Rivas gang members.  He knows what's going on.  *He chose to be part of this lifestyle, he chose to accept this culture, the subculture of violence and death and destruction.*  The values that we try to instill in our kids, respect, they're perverted with gang members.  They're just synonymous with fear.  [¶]  'Eastside Rivas' in the residence.  We saw that.  'ESR CLPS' graffiti on the house next door.  Part of a violent gang culture, we see it play out first hand in this case.  *This is what happens.  His moniker is Trigger.  How fitting.*  Fimbres, Barbarian, Galvan all Eastside Rivas gang members.  *The murder happened on Park Avenue.*  That's his neighborhood.  That is the neighborhood, the area of CLPS, his clique."  (Italics added.)

14

As relevant here, the omitted portion of CALCRIM No. 1400 states: "*Felonious criminal conduct* means committing or attempting to commit [any of] the following crime[s]: _____ *insert felony or felonies by gang members that the defendant is alleged to have furthered, assisted, promoted or directly committed>*. . . . [¶] To prove that the defendant aided and abetted felonious criminal conduct by a member of the gang, the People must prove that: [¶] 1. A member of the gang committed the crime; [¶] 2. The defendant knew that the gang member intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the gang member in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

Duarte concedes, and we agree: "It is evident from the amended information that the prosecution was charging [him] with section 186.22, subdivision (a) under the theory that the murder of Barbarian [*sic*] was the underlying felonious criminal conduct, because the date listed for count 3 was the same date as the shooting of Barbarian [*sic*]." Nonetheless, Duarte argues, "[T]he fact that the jury found [him] guilty of the murder of Barbarian [*sic*] did not mean that they would have concluded appellant was guilty of section 186.22, subdivision (a) had they been properly instructed that felonious criminal conduct meant the commission of murder because the jury would also have had to have found that [he] committed the murder *in concert* with another gang member, in this case Fimbres being the only possibility." He elaborates, "[T]he only available evidence on this matter came from Fimbres, who testified

15

that he was a bystander to the shooting, which [Duarte] perpetrated on his own because Barbarian [*sic*] had taken money from him."

This contention fails in light of our having rejected Duarte's claim there was insufficient corroboration evidence to support the charge he and Fimbres were accomplices or acted in concert. We also note that the court thoroughly instructed the jury regarding aiding and abetting, including with CALCRIM Nos. 400 and 401. Although the better practice would have been for the court to specify the felonious conduct at issue here, considering the totality of the court's instructions and the prosecutor's arguments, the principal felonious conduct for which Duarte was being held to answer was Barbarin's murder. We conclude it is not reasonably likely the jury interpreted the instruction to apply to any other felony besides the murder charge, and it did not convict Duarte merely for his gang membership. The trial testimony regarding other felonies was presented in the context of establishing what crimes Eastside Rivas gang members generally committed. That testimony was not specifically developed or tailored to support the charges brought against Duarte. Thus, Duarte was not prejudiced by the court's instruction with CALCRIM No. 1400 because there was not sufficient evidence adduced to confuse the jury regarding his personal involvement in other felonious conduct, and no indication of actual jury confusion. It is not reasonably probable Duarte would have received a more favorable outcome if the court had instructed the jury that the specific felony he had committed was murder.

IV.

Duarte contends the court prejudicially erred in instructing the jury that Galvan had refused to testify and it could take that fact into consideration.[5]  Specifically, Duarte argues: "Galvan's unsworn statements to the trial court that he did not want to testify and would refuse to do so, was not evidence.  The court, in essence, improperly instructed the jury on facts outside the evidence rather than staying within the bounds of its duty to instruct only on law applicable to the evidence."  Duarte adds that the prosecution in closing arguments compounded the court's error by arguing the jury could infer Galvan was going to testify that Duarte was guilty because otherwise Galvan would have had no fear of repercussion from his gang members.[6]

---

[5]     The court instructed the jury:  "Outside your presence, a witness was called to testify who refused to answer any questions for either the defense or the prosecution.  The witness, Gerald Galvan, did not invoke his right to testify under the Fifth Amendment against self-incrimination.  Mr. Galvan simply refused to answer any questions.  Because Mr. Galvan did not invoke his constitutional right under the Fifth Amendment, the Court issued an order to Mr. Galvan that he must testify.  Mr. Galvan continued to refuse.  Mr. Galvan was found in contempt of court and was punished with a jail sentence.  You are instructed that Mr. Galvan is unavailable for either side to call as a witness.  While the court is not instructing any juror to draw any inferences from Mr. Galvan's refusal to testify, the Court is also not instructing you that you may not draw inferences.  Whether or not Mr. Galvan's refusal to testify supports any inferences in this case is for the jury to decide."

[6]     The prosecutor argued, "Now, Detective Miera testified at length these guys can't come in and incriminate their own gang, members of their own gang or even rival gang members.  You can't.  Someone comes up, shoots your brother right next to you and that's a rival gang member, you can't cooperate and come in and testify and point him out.  If not, you're a snitch and go to [protective custody].  And they do not want to be in [protective custody].  That's what happens when you testify.  [¶]  Now he also said that they aren't prevented from giving testimony that might be helpful, i.e., it wasn't him.  I'll tell you what happened, but it wasn't him because that's not perceived as hurting the gang."

17

Galvan was subpoenaed to testify at Duarte's trial. However, Galvan told the court in the first proceeding outside the jury's presence that he would refuse to abide by the court's order to testify. The court found him in contempt and sentenced him to five days in prison besides the term he was currently serving for an unrelated offense. The prosecutor requested that the court order Galvan to appear in court and state his refusal to testify before the jury. Defense counsel declined the court's invitation to address the prosecutor's request. The court refused the request, and instead stated it would instruct the jury regarding Galvan's refusal. At a second hearing on this matter, the prosecutor reiterated his request for a court order requiring Galvan to take the witness stand, explaining: "I think it's important for the jurors to see Mr. Galvan, to see the way he acts. To see the demeanor. You know, we talk about gang members in this case, we talk about gang members refusing to testify, being snitches, it's important for them to see it too, not just in a sanitized environment with a sanitized description." Defense counsel again declined the court's request for input on this matter. On a third occasion, on the day scheduled for Galvan's testimony, the court asked Galvan outside of the jury's presence if he would testify as ordered. Galvan again stated he would refuse to testify.

The court sought the parties' input regarding its proposed instruction about Galvan's refusal to testify. The prosecutor offered a modification of the court's instruction. But defense counsel was indifferent as between the court's original version of the instruction and the modified instruction, saying, "I'm fine with either one."

Duarte raised no objection; consequently, he may not claim error on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 326 [waiver found where defense counsel agreed to giving of instruction and raised no objection]; *People v. Jennings* (1991) 53 Cal.3d 334, 374 [failure to

18

object to court's proposed special instruction forfeits claims on appeal]; see also *People v. Vera* (1997) 15 Cal.4th 269, 275 [as a general rule, appellate court will not consider claims of error that could have been but were not raised in trial court]; *People v. Viray* (2005) 134 Cal.App.4th 1186, 1209 [claims waived even if they affect substantial right where no objection in trial court].)

Separately, any error was invited in light of the three opportunities the court gave defense counsel to weigh in on the proposal to give the instruction instead of requiring Galvan's appearance in court. "When a defense attorney makes a 'conscious, deliberate tactical choice' to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error." (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.) " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal . . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' " (*People v. Coffman* (2004) 34 Cal.4th 1, 49.) Here, a clearly implied tactical purpose for defense counsel to decline to challenge either the court's instruction or the prosecution's modification was that the alternative would have been for Galvan to testify. From the defense's standpoint, the court's instruction was preferable to having Duarte's case harmed by the jury witnessing Galvan's demeanor as he refused to testify.

Moreover, Duarte does not argue the trial court's instruction was erroneous or misstated the facts regarding Galvan's repeated refusal to testify; instead, he claims the court's instruction was not evidence. We conclude that under the cases cited above, it was within the court's

19

discretion to call Galvan to the witness stand and permit him to declare his refusal to testify. The court's decision to instead instruct the jury was not an abuse of discretion. The instruction was more favorable to Duarte because the jury was deprived of an opportunity to assess Galvan's demeanor as he refused to testify. Galvan's refusal possibly would have reinforced for the jury the expert's claim that gangs exercise a hold on its members by denying them the liberty to testify in gang cases.

Further, there was no prejudice to Duarte from the instruction itself, which merely stated the jury was to decide what weight to accord Galvan's refusal to testify. To the extent Duarte relies on the prosecutor's arguments to bolster his claim of prejudice, the claim is unavailing. The court instructed the jurors with CALCRIM No. 104, which informed them, inter alia, that counsel's comments during closing argument were not evidence and it was for the jury to determine what the facts were.

## V.

Duarte contends the cumulative effect of the alleged errors requires reversal. (*People v. Holt* (1984) 37 Cal.3d 436, 458-459.) We find no error that, either alone or in conjunction with others, prejudiced Duarte. (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

## VI.

The People concede and we agree that under *People v. Mesa* (2012) 54 Cal.4th 191, 197-198), the court should have stayed the count 3 sentence because under section 654, it was error to punish Duarte for the murder and again for committing the murder while acting as a gang member.

20

DISPOSITION

The sentence for count 3 is stayed under Penal Code section 654. As so modified, the judgment is affirmed. We direct the trial court to amend the abstract of judgment accordingly and forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

O'ROURKE, J.

WE CONCUR:

McINTYRE, Acting P. J.

AARON, J.