Filed 9/2/16  P. v. Anagnostou CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>GEORGE J. ANAGNOSTOU,<br><br>       Defendant and Appellant. | A145335<br><br>(San Mateo County<br>Super. Ct. No. SC079014A) |

A jury found George Anagnostou guilty of stalking a neighbor (Pen. Code, § 646.9, subd. (a))[1] and making criminal threats to another person (§ 422).  The jury further found true an allegation that he had suffered a prior felony conviction for which he had served a prison term.  (§ 667.5, subd. (b).)  Anagnostou alleges prosecutorial misconduct in argument and ineffective assistance of trial counsel in failure to effectively preserve the misconduct claim.  We reject both claims and affirm.

## I.     BACKGROUND

Anagnostou does not challenge the sufficiency of the evidence to support his convictions.  We discuss the relevant facts for background and context.

---

[1] Undesignated statutory references are to the Penal Code.

1

*Stalking*

The victim, Luiza,[2] lived on a cul-de-sac in a San Bruno residential neighborhood with her husband and two daughters. Anagnostou's house was situated near the entrance of the cul-de-sac.

After Luiza declined Anagnostou's invitation to go with him on a motorcycle ride and to accompany him to Greece, Anagnostou began to stand outside his home and to watch Luiza's family "nonstop." On one occasion in 2001, Luiza returned home with her then 12-year-old daughter, Julie, and parked near Anagnostou's house. Anagnostou ran after them, grabbed Julie's arm, and said he needed to speak to the child in private. When Luiza refused, Anagnostou became aggressive and cursed at her.

Over the next five years, Anagnostou's obsessive behavior escalated. He stood outside and called out Luiza's and Julie's names. He attempted to stop Luiza's car, sometimes jumping in front of it. He placed food at the family's door and in their mailbox. Anagnostou also called the family home multiple times a day, stating he wanted to see Luiza and Julie and "get rid of" Luiza's husband, Roman. Luiza changed her phone number several times, but Anagnostou called the new numbers even though they were unlisted.

In January 2006, Anagnostou came to Luiza's home, rang the bell at least 20 times, tried to push his way inside, and threatened to kill Roman when he refused to let Anagnostou enter. The family called the police. The following February, Anagnostou again came again to Luiza's home. Julie was in the hot tub in the backyard, not visible from the street. Anagnostou arrived at the house carrying towels, banged on the door for at least 20 minutes and told Luiza he wanted to come inside and take care of her and Julie. Another neighbor told Anagnostou to leave. Anagnostou became upset and got into a physical confrontation with the neighbor's son. Anagnostou was arrested. Luiza and the neighbors obtained restraining orders against Anagnostou.

---

[2] Consistent with the practice at trial, we do not use the surnames of the victims or their family members to protect their privacy.

Anagnostou was undeterred.  He continued to watch Luiza's family as they came and went from their home, and he would jump in front of her car as she drove home.  In June 2006, Julie was home alone.  When Julie went outside to retrieve books from her car, Anagnostou approached her.  She ran, and Anagnostou screamed, "Yeah, run, whore, bitch."  Anagnostou was arrested for violating the restraining order.  In 2008, he was convicted of stalking Julie.

After serving his sentence, Anagnostou returned to the neighborhood in late 2009.  He resumed his earlier behavior.  He watched Luiza's movements to and from her home, screamed her name, stated that he wanted to take care of her, and came to her home and rang her doorbell on three or four occasions.

In October 2012, Anagnostou came to Luiza's home.  When Roman opened the door, Anagnostou was incoherent and repeatedly said, "Mike Socratis is bugging my house."  Anagnostou refused to leave, saying that he had to get rid of Roman.  Roman had to push Anagnostou away from the front door.  The police were called.

In April 2013, Anagnostou called Luiza's South San Francisco office multiple times, mumbling her name and saying that he wanted to see her.  Luiza was alone at the time.  When she heard Anagnostou's motorcycle outside, she locked the door and hid behind her desk.  Anagnostou banged on the glass door with his fist for 15 to 20 minutes, insisting that Luiza open it.  She called police, but Anagnostou left before they arrived.

Three other incidents occurred during June and July 2013.  In the first, Luiza saw Anagnostou on his motorcycle in a grocery store parking lot while she was shopping.  He screamed her name, drove up to her, and attempted to grab her arm.  In another incident, Anagnostou went to Luiza's church.  She had never seen him attend that church before that day.  She hid in the back of the church, returned to her car, and left.  And in yet another incident, a neighbor saw Anagnostou pacing back and forth in his driveway, talking to himself.  Anagnostou was heard to say, "If it wasn't for Johansen, I could get Julie and Luiza."  San Bruno Police Officer Johansen had arrested Anagnostou in 2006 for stalking Julie.

3

In August 2013, Anagnostou was arrested for stalking Luiza. During a search of his house, the searching officer observed that Luiza's house was directly visible from Anagnostou's living room couch, on which police found a pair of binoculars. A restraining order was issued against Anagnostou prohibiting contact with Luiza. Despite the restraining order, Anagnostou sent Luiza letters, largely obscene, from jail to her home and office.

Luiza remains afraid of Anagnostou. As a result of Anagnostou's behavior, Roman and Luiza installed a surveillance system at their house. They planted shrubbery to obstruct views into their house, locked the gates, and built fences. At one point, Roman kept a gun in the house because he feared Anagnostou. Luiza and Julie both sought therapy, and Luiza was prescribed medication to help her deal with the stress.

*Criminal Threats*

Michael and his wife Gina lived in South San Francisco with their two children. Michael and Anagnostou met in the 1980's and had occasionally spoken on the phone. The two had not spoken in years until Anagnostou called Michael around 2003. Anagnostou then called Michael's residence a few days later after midnight. Gina answered the phone and told Anagnostou, "We're asleep. Don't call," and hung up. Anagnostou called back saying he really needed to speak to Michael. When Gina told him not to call again, Anagnostou called her a "fucking bitch." Anagnostou called even later the next night and said he really needed to speak to Michael. When Gina did not allow him to talk to Michael, Anagnostou again became belligerent. Anagnostou made over a dozen phone calls asking for Michael. Michael and Gina blocked Anagnostou's number and received no further calls for about two years. When the calls resumed, Michael and Gina again blocked Anagnostou's number.

In about 2010, the calls from Anagnostou resumed. The calls were less frequent but more belligerent. Anagnostou said several times he wanted to kill the couple. Gina feared Anagnostou would show up at their home and carry out his threats. Gina again blocked Anagnostou's number, and the calls stopped.

Around 12:30 a.m. on March 11, 2013, Anagnostou appeared at Michael's and Gina's residence and banged loudly on the door, asking for "Mike."  Recognizing Anagnostou's voice, Gina became afraid, refused to open the door, and told Anagnostou to get off the property.  Michael also came to the door, and both heard Anagnostou outside saying very loudly, "I'm going to fucking kill you."  Michael took Anagnostou's statement as a legitimate threat and believed he and his family were at risk.  Gina called the police.  As Gina spoke to the police dispatcher, Anagnostou left on his motorcycle. He was stopped by a South San Francisco police officer a few blocks away from the couple's residence.  When Anagnostou was arrested a piece of paper including the couple's address and phone number was found in his pocket.

*Trial*

Anagnostou was charged by information with stalking Luiza on and between July 1, 2012, and August 15, 2013 (§646.9, subd. (a); count 1), and with criminal threats against Michael on or about March 11, 2013 (§422; count 2).  The information further alleged that Anagnostou had sustained a prior felony conviction resulting in a prison term (§667.5).  A jury found Anagnostou guilty on both counts.  In a bifurcated proceeding, the jury also found true the sentence enhancement allegation.

The trial court sentenced Anagnostou to an aggregate term of four years eight months in prison (a three-year aggravated term on count 1; consecutive eight-month term (1/3 of midterm) on count 2; and a one-year consecutive term for the prison prior). Anagnostou filed a timely notice of appeal.

## II.    DISCUSSION

Anagnostou premises his appeal on a single statement made by the prosecutor at the conclusion of her opening argument—or more accurately, on the use of the conjunctive "and" in the last sentence of that argument.  In the final sentence of the argument, the prosecutor said:  "Give Luiza reprieve, give Luiza a chance to have her life back and find the defendant guilty not only of the stalking charge but also of the criminal threats charge."  Anagnostou cites that statement as misconduct, alleging that the prosecutor was improperly urging the jury to convict him of what he characterizes as the

5

"weaker" charge of criminal threats in order to subject him to greater punishment, thereby "removing Mr. Anagnostou from the neighborhood for a longer period of time" and giving Luiza a longer "reprieve" from Anagnostou's behavior. He argues that his trial counsel was ineffective to the extent that counsel failed to make an adequate contemporaneous objection to the statement. Neither argument has merit.

A.     *Prosecutorial Misconduct*

"  'A defendant's possible punishment is not a proper matter for jury consideration.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 486; *People v. Holt* (1984) 37 Cal.3d 436, 458.) Under the federal standard, prosecutorial misconduct is reversible error if it infects the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108.) "In contrast, under our state law, prosecutorial misconduct is reversible error where the prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 955.)

"When the issue 'focuses on comments made by the prosecutor before the jury, [as in this case], the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203.) "Although defendant singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*Id*. at p. 1203; *People v. Morales* (2001) 25 Cal.4th 34, 44–47 [prosecutor's statement must be evaluated in the context of the entire record, including instructions and the argument as a whole].)

B.     *Forfeiture*

Our Supreme Court has repeatedly held that, to preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely and specific objection

and ask the trial court to admonish the jury to disregard the improper argument. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305; *People v. Martinez, supra,* 47 Cal.4th at p. 956; *People v. Cole, supra*, 33 Cal.4th at p. 1201.) The People argue that Anagnostou has forfeited his claim of misconduct by failure to make a specific objection to the challenged statement. We agree.

At the time the challenged statement was made, defense counsel interjected, "Objection, Your Honor, as to the last statements about Luiza getting her life back and so forth. That's speculative as to future consequences and doesn't really address the elements." The trial court overruled the objection. Counsel did not assert that the statement was an improper allusion to punishment, nor did he request a curative admonition. A claim of misconduct is preserved for review in this circumstance only if an admonition would not have cured the harm. (*People v. Sanchez* (2016) 63 Cal.4th 411, 475–476; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) Assuming that the prosecutor's brief remark could have been construed by the jury as Anagnostou suggests, "any prejudice to defendant could easily have been dispelled by an admonition from the bench." (*People v. Salazar* (2016) 63 Cal.4th 214, 254; see *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*) [nothing in "prosecutor's argument so extreme or pervasive that a prompt objection and admonition would not have cured the harm"].) Failure to request an admonition is fatal to Anagnostou's claim.

C.    *Ineffective Assistance of Counsel*

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) Anagnostou argues that, if his misconduct claim has been forfeited, his trial counsel provided ineffective assistance. We disagree.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to effective assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215; *Strickland v. Washington* (1984) 466 U.S. 668, 684–686.) This right "entitles [the defendant] to 'the

7

reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' " (*Ledesma,* at p. 215.) To establish ineffective assistance of counsel, a defendant bears the burden of showing, by a preponderance of the evidence, that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness, under prevailing professional norms, and (2) the deficient performance was prejudicial, rendering the results of the trial unreliable or fundamentally unfair. (*Centeno, supra*, 60 Cal.4th at p. 674; *Strickland,* at pp. 688, 692; *Ledesma*, at pp. 216–217.) To satisfy the prejudice requirement, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) The "ultimate focus" of the *Strickland* inquiry is on whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process . . . ." (*Id.* at p. 696.)

A " 'mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (*Centeno*, *supra*, 60 Cal.4th at p. 675.) Under federal *Strickland* standards, " 'absent egregious misstatements,' " failing to object to error during closing argument falls within the " ' "wide range" ' " of reasonable assistance. (*Cunningham v. Wong* (9th Cir. 2013) 704 F.3d 1143, 1159.)

As a threshold matter, we disagree that the prosecutor's comment rose to the level of misconduct. We question whether there is any reasonable likelihood the jury would have construed the prosecutor's statement as an allusion to punishment, and see no indication "in the context of the argument as a whole" (*People v. Cole, supra,* 33 Cal.4th at p. 1203) that the comment was intended in that fashion. In conducting our inquiry, " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra,* 60 Cal.4th at p. 667.)

The statement came at the very end of the prosecutor's opening argument when she, not surprisingly, concluded by urging the jury to find Anagnostou guilty of *both*

charges. Unlike the cases cited by Anagnostou, the concurrent statements that convicting Anagnostou would give Luiza a "reprieve" and help Luiza "get her life back" made no reference to the punishment Anagnostou might receive on the charged offenses, either singly or in combination. (Cf. *People v. Thomas, supra*, 51 Cal.4th at p. 486 [improper for prosecutor to argue to jury that defendant could be released on parole if special circumstances allegation not found true]; *People v. Holt, supra*, 37 Cal.3d at pp. 457–458 & fn.14 [misconduct to argue to jury that, if it did not find the defendant committed murder during commission of a robbery, it " 'just guaranteed [the defendant] a parole date' " (italics omitted)].)

Consideration of the argument as a whole belies Anagnostou's suggested interpretation. For example, the prosecutor's very first comment in her rebuttal argument was, "So [defense counsel] started off by saying something that I think is absolutely true, is that you shouldn't use your sympathy that you feel for Luiza to convict the defendant of either the stalking charge or the sympathy that you may feel for [Michael and Gina] to convict him of the criminal threats charge. You should look at the evidence, apply the facts to the law and find the defendant guilty based on the evidence." Anagnostou points to nothing else in the prosecution argument that even hints that the jury should improperly consider punishment. We find nothing in the prosecutor's arguments to the jury that could remotely be considered egregious behavior that rendered his trial fundamentally unfair, or that would suggest a reasonable probability that the outcome was changed. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1274.) Nor do we find anything in this record that would support a claim the prosecutor engaged in deceptive or reprehensible methods of persuasion. In sum, there was no misconduct.

Even if we could find the prosecutor's statement was somehow an opaque reference to punishment significant enough to qualify as misconduct, we would still conclude the claim of ineffective assistance fails. A defendant also bears the burden of showing prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Neely* (2009) 176 Cal.App.4th 787,

9

796.) Following closing arguments, the trial court correctly instructed the jury on the presumption of innocence, reasonable doubt, and the prosecutor's burden of proof. The jury was told not to let bias, sympathy, or prejudice influence their decision. Moreover, the jury was expressly instructed that it could not consider the question of penalty or punishment in determining Anagnostou's guilt.

We presume the jury relied on the instructions, not the arguments of counsel, in convicting Anagnostou.[3] (*People v. Morales, supra,* 25 Cal.4th at p. 47.) " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' " (*Centeno, supra,* 60 Cal.4th at p. 676.) It is not reasonably probable that Anagnostou would have achieved a more favorable result but for trial counsel's failure to object.[4]

### III. DISPOSITION

The judgment is affirmed.

---

[3] In assessing prejudice, Anagnostou contends we should consider that the evidence on the criminal threats charge was "relatively weak." As previously noted, Anagnostou does not challenge sufficiency of the evidence to support the conviction, and we find no reason to ignore the presumption that this jury followed the instructions given.

[4] Anagnostou suggests that *Chapman*, requiring that lack of prejudice be shown beyond a reasonable doubt, is the applicable standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24.) While *Chapman* may well apply to misconduct resulting in an unfair trial and a denial of due process, it is irrelevant here, since we find no error of constitutional dimension.

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
NEEDHAM, J.

11